UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

             Plaintiff,

v.

Alexia Gah Gi Gay Mary Cutbank (1),
Mia Faye Sumner (2),

             Defendants.

Case No. 21-cr-268 (SRN/LIB)

**ORDER AND
REPORT AND RECOMMENDATION**

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon the parties' various Motions for the discovery and production of evidence, [Docket Nos. 53, 54, 55, 56, 57, 76, 77, 78, 79, 80, 81, 82, 83, 84, 86, 89, 90, 95, 96], Defendant Mia Faye Sumner's ("Defendant Sumner") Motion to Suppress Statements, Admissions, and Answers, [Docket No. 58], as well as, Defendant Alexia Gah Gi Gay Mary Cutbank's ("Defendant Cutbank") Motion to Suppress Evidence Obtained from Unlawful Search and Seizure. [Docket No. 87]. The Court held a Motions hearing on March 22, 2022, regarding the parties' pretrial motions.[1]

For the reasons discussed herein, Defendant Sumner's Motion for Disclosure of Rule 404 Evidence, [Docket No. 53]; Motion to Compel Attorney for the Government to Disclose Favorable Evidence, [Docket No. 54]; Motion for Discovery and Inspection, [Docket No. 55]; Motion to Retain Rough Notes, [Docket No. 57], are **GRANTED** as set forth herein. Defendant Sumner's Motion for Disclosure of Early Jencks Act Material, [Docket No. 56]; Motion to Provide Grand

---

[1] Based on the representations of the parties at the March 22, 2022, Motions Hearing and for the reasons stated on the record, Defendant Cutbank's Motion to Suppress Statements, [Docket No. 88], was termed as moot, and Defendant Sumner's Motion to Sever, [Docket No, 96], was withdrawn without prejudice. (Minute Entry, [Docket No. 58]).

Jury Testimony of Any Witness Who Will Testify at Suppression Hearing, [Docket No. 76], and Motion for Disclosure of Post Conspiracy Statements of Co-Defendants and Unindicted Co-Conspirators, [Docket No. 95], are **DENIED** as set forth herein.

Defendant Cutbank's Motion to Retain Rough Notes, [Docket No. 77]; Motion for Disclosure of 404(b) "Bad Acts" Evidence, [Docket No. 78]; Motion to Compel Production of Giglio Material, [Docket No. 79]; Motion for Release of Brady Materials, [Docket No. 80]; and Motion for Discovery and Inspection, [Docket No. 86], are **GRANTED** as set forth herein. Defendant Cutbank's Motion for Disclosure (Early) of Jencks Act Material, [Docket No. 81]; Motion to Sever, [Docket No. 82]; Motion for Disclosure of Grand Jury Transcripts, [Docket No. 83]; and Motion for Disclosure of Confidential Reliable Informant(s), [Docket No. 84] are **DENIED** as set forth herein.

Government's Motion for Discovery for Defendant Sumner, [Docket No. 89], and Government's Motion for Discovery for Defendant Cutbank, [Docket No. 90], are **GRANTED** as set forth herein.

Lastly, the Court recommends that Defendant Sumner's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 58], be **DENIED**; and Defendant Cutbank's Motion to Suppress Evidence Obtained from Unlawful Search and Seizure, [Docket No. 87], be **DENIED**.

## I.    Background

Defendant Alexia Gah Gi Gay Mary Cutbank and Defendant Mia Faye Sumner are each charged with one (1) count of murder in the second degree in violation of 18 U.S.C. §§ 2, 1111, 1151, 1153(a), one (1) count of assault with a dangerous weapon in violation of 18 U.S.C. §§ 2, 113(a)(3), 1151, 1153(a), as well as, one count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 2, 113(a)(6), 1151, and 1153(a). (Indictment, [Docket No. 1]).

II.    **Defendant Sumner Motion for Disclosure of 404(b) Evidence, [Docket No. 53], and Defendant Cutbank's Motion for Disclosure of 404(b) "Bad Acts" Evidence. [Docket No. 78].**

Defendant Sumner and Defendant Cutbank both seek disclosure of any "bad act" or "similar course of conduct" evidence that the Government intends to offer at trial pursuant to Federal Rule of Evidence 404(b).  (See Def. Sumner's Mot. for Disclosure of 404(b) Evidence, [Docket No. 53]; Def. Cutbank's Mot. for Disclosure of 404(b) Evidence, [Docket No. 78]). Defendant Sumner seeks such disclosure "immediately," while Defendant Cutbank seeks such disclosures at least four (4) weeks before trial.  (Id.).

In its written response to both motions, acknowledging its obligation to comply with Rules 404(b), the Government has represented that it has previously disclosed Rule 404(b) evidence to the Defendants within its possession and will continue to comply with its obligations. (See Gov't's Consolidated Response to Defendants' Pretrial Motions, [Docket No. 93], at pp. 4-5)  Although the Government noted that it was unaware of the extent of said evidence it would offer at trial, the Government has suggested that disclosures regarding Rule 404(b) evidence be made by no later than two (2) weeks before trial.

In relevant part, Rule 404(b)(3) provides that the Government must "provide reasonable notice of any" Rule 404(b) "evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it." Fed. R. Evid. 404(b)(3)(A). In that notice, the Government must also "articulate . . . the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B).

Defendant Sumner and Defendant Cutbank's Motions for Disclosure of Rule 404(b) Evidence, [Docket Nos. 53, 78], are granted, as set forth herein. The Court orders the Government to disclose to the Defense as soon as practicable, and in no event later than twenty-one (21) days

before trial, formal notice of any specific 404(b) evidence it intends to offer, as well as, the purpose for which it intends to offer it into evidence at trial.[2]

**III.    Defendant Sumner's Motion to Compel Attorney for the Government to Disclose Favorable Evidence, [Docket No. 54], Defendant Cutbank's Motion to Compel Production of Giglio Material, [Docket No. 79], and Defendant Cutbank's Motion for Release of Brady Materials. [Docket No. 80].**

Defendant Sumner and Defendant Cutbank both seek disclosure of evidence favorable to them which would fall within the authority of Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny. (Def. Sumner's Mot. for Disclosure of Evid. Favorable to Def., [Docket No. 54]; Def. Cutbank's Mot. to Compel Production of Giglio Material, [Docket No. 79]; Def. Cutbank's Mot. to Compel Production of Brady Material, [Docket No. 80]).  At the Motions Hearing regarding the present Motions, both Defendant Sumner and Defendant Cutbank requested that the Government's disclosure of favorable evidence be made by no later than fifteen (15) business days before trial.

The Government, acknowledging its duty to disclose responsive materials and information, represented that it has previously disclosed evidence favorable to Defendant Sumner and Defendant Cutbank within its possession and will continue to comply with its obligations under Brady, Giglio, and their progeny. (See Gov't's Consolidated Response to Defendants' Pretrial Motions, [Docket No. 93], at pp. 5-6.  The Government suggested that disclosures regarding prior criminal records of the Government's witnesses or any promises or agreements between the Government and its witnesses be made seven (7) business days before trial.  At the Motions Hearing, the Government suggested disclosure of materials responsive to Giglio and related to the

---

[2] Federal Rule of Evidence 404(b) does not extend to evidence of acts which are "intrinsic" to the charged offense. United States v. Adediran, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule 404(b) do not apply to such "inextricably intertwined" evidence); see United States v. Williams, 900 F.2d 823 (5th Cir. 1990).

impeachment of the Government's witnesses to be called at trial no later than seven (7) business days before trial.

The Government will disclose any and all remaining and/or subsequently discovered, obtained, or obtainable material responsive to <u>Brady</u> to the Defense as soon as said responsive materials are discovered by the Government.[3]

The Government will disclose materials which are responsive to <u>Giglio</u> and related to the impeachment of the Government's witnesses to be called at trial no later than seven (7) business days before trial, or when ordered by the trial judge to disclose trial witnesses, whichever is earlier.

## IV.    Defendant Sumner's Motion for Discovery and Inspection, [Docket No. 55], and Defendant Cutbank's Motion for Discovery and Inspection. [Docket No. 86].

Defendants Sumner and Cutbank seek disclosure of any written, recorded, or oral statements made by Defendants or copies thereof in the possession, custody, or control of the Government; the substance of any oral statements made by Defendants or co-defendants, whether before or after arrest, which the Government intends to offer in evidence at the trial; as well as, a copy of their criminal history. (Def. Sumner's Mot. for Discovery and Inspection, [Docket No. 55]; Def. Cutbank's Mot. for Discovery and Inspection, [Docket No. 86]).

Furthermore, Defendants both request permission to inspect and/or copy books, papers, documents, photographs, and tangible objects in the possession, custody, or control of the Government and which are material to the preparation of the defense or are intended for use by

---

[3] The Court notes that in <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), the United States Supreme Court "emphasized the discretion of the *prosecutor*, not the trial judge, in deciding what evidence is producible under <u>Brady</u>." <u>United States v. Garrett</u>, 238 F.3d 293, 304 n.4 (5th Cir. 2000) (emphasis added). The Sixth Circuit has also explained that "while the <u>Brady</u> rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." <u>United States v. Clark</u>, 957 F.2d 248, 251 (6th Cir. 1992). That being said, "[i]f [the Government] fails to comply adequately with a discovery order requiring it to disclose <u>Brady</u> material, it acts at its own peril." <u>Id.</u> Accordingly, the Court encourages the Government to carefully evaluate the materials in its possession in light of a liberal understanding of its <u>Brady</u> obligations.

the Government as evidence in chief at the trial or were obtained from or belonged to Defendants. (Id.).

Defendants both also request permission to inspect and copy the results of any physical or mental examinations or scientific tests or experiments. Pursuant to Rule 16(a)(1)(G), Defendants request written summaries of any expert opinion the Government intends to use in its case-in-chief, including expert witnesses' qualifications and opinions, as well as, the basis for those opinions. Defendants do not suggest a proposed deadline by which the Government must produce disclosure regarding Rule 16(a)(1)(G), but at the Motions Hearing, Defendant Sumner and Defendant Cutbank requested that said expert disclosures be made by no later than forty-five (45) days before trial, and any rebuttal expert be disclosed fifteen (15) days before trial.

In its written response to Defendant Sumner and Defendant Cutbank's Motions, the Government asserted that it had already disclosed substantial materials pursuant to Rule 16, and it would continue to comply with its obligations under Rule 16. (See Gov't's Consolidated Response to Defendants' Pretrial Motions, [Docket No. 93], at pp. 9-10). At the March 22, 2022, Motions hearing, the Government agreed on the record to disclosure of expert opinions forty-five (45) days before trial, and any rebuttal expert be disclosed fifteen (15) days before trial.

Defendant Sumner and Defendant Cutbank's Motions for Discovery and Inspection, [Docket Nos. 55, 86], are granted as to any subsequently acquired materials or information which are specifically responsive to Rule 16(a)(1)(A)-16(a)(1)(E), which shall be disclosed to the Defense as soon as said responsive materials are discovered by the Government and in any event by no later than fourteen (14) days before trial, except with respect to expert disclosures, Rule 16(a)(1)(F)-16(a)(1)(G), which shall be disclosed as soon as practicable and in any event by no later than forty-five (45) days before trial, and rebuttal expert disclosures, which shall be disclosed by no later than fifteen (15) days before trial.

## V. Defendant Sumner's Motion for Early Disclosure of Jencks Act Material, [Docket No. 56], and Defendant Cutbank's Motion for Disclosure of Early Jencks Act Material. [Docket No. 81].

Defendant Sumner and Defendant Cutbank both move the Court for an Order requiring the Government to disclose Jencks Act materials at least two weeks before trial. (See Def. Sumner's Mot. for Early Disclosure of Jencks Act Material, [Docket No. 56]; Def. Cutbank's Mot. for Disclosure of (Early) Jencks Act Material, [Docket No. 81]).

The Government objects to Defendant's motion arguing that it cannot be <u>required</u> to make pretrial disclosure of Jencks Act materials before a witness has testified.   (See Gov't's Consolidated Response to Defendants' Pretrial Motions, [Docket No. 93], at p. 7).

The Court recognizes the practical effect that disclosing Jencks Act materials only after a witness has actually testified in the Government's case-in-chief creates the prospect for unnecessary continuances and delays in the trial while the Defense is permitted a reasonable time to review the late disclosures.  However, Defendants provide no citation to any recent authority which would allow the Court to <u>require</u> early disclosure of Jencks Act material.  Generally, the case law provides that the Court may not require the Government to make early disclosure of Jencks Act material. <u>See, e.g.</u>, <u>United States v. Alexander</u>, 736 F. Supp. 968, 981 (D. Minn. 1990); <u>United States v. White</u>, 750 F.2d 726, 727 (8th Cir. 1984); <u>United States v. Wilson</u>, 102 F.3d 968, 971–72 (8th Cir. 1996).

Accordingly, Defendant Sumner and Defendant Cutbank's Motions for Early Disclosure of Jencks Act Material, [Docket Nos. 56, 81], are denied.[4]

## VI. Defendant Sumner's Motion for Retention of Rough Notes, [Docket No. 57], and Defendant Cutbank's Motion to Retain Rough Notes. [Docket No. 77].

---

[4] Nevertheless, in its written response, the Government asserted that it had already disclosed some material that may fall under the Jencks Act in its initial disclosures, and it voluntarily agreed to provide all Jencks Act materials to the Defense by no later seven (7) business days before trial.  The Court encourages such voluntarily agreements.

Defendant Sumner and Defendant Cutbank both request an Order from the Court requiring any law enforcement agent, including confidential informant, to retain and preserve all rough notes taken as part of their investigations, whether or not the contents of such rough notes are incorporated in official records. (See Def. Sumner's Mot. for Retention of Rough Notes, [Docket No. 57]; Def. Cutbank's Mot. for Retention of Rough Notes, [Docket No. 77]).

The Government does not object to Defendants' request for the retention of rough notes but does object to any order concerning the disclosure of rough notes.  (See Gov't's Consolidated Response to Defendants' Pretrial Mot., [Docket No. 93], at pp. 3-4).

Defendant Sumner and Defendant Cutbank's motions are granted regarding rough notes as to retention only at this time.  If Defendants seek production or disclosure of rough notes, they will need to bring a separate motion for such production.

**VII.    Defendant Sumner's Motion to Provide Grand Jury Testimony of Any Witness Who Will Testify at Suppression Hearing, [Docket No. 76], and Defendant Cutbank's Motion for Disclosure of Grand Jury Transcripts. [Docket No. 83].**

Defendant Sumner and Defendant Cutbank both move the Court to order the Government to disclose Grand Jury transcripts for those witnesses the Government intends to call at the Motions hearing.  (Def. Sumner's Mot. to Provide Grand Jury Testimony of Any Witness Who Will Testify at Suppression Hearing, [Docket No. 76]; Def. Cutbank's Mot. for Disclosure of Grand Jury Transcripts, [Docket No. 83]). Additionally, Defendant Cutbank requests an Order from the Court requiring disclosure of all grand jury witness transcripts of anyone whom the Government intends to call as trial witnesses.

The Government represented at the March 22, 2022, Motions hearing that neither officer testifying at Motions hearing had testified before the Grand Jury.  Accordingly, based on the Government's representation, Defendant Sumner's Motion to Provide Grand Jury Testimony of Any Witness Who Will Testify at Suppression Hearing, [Docket No. 76], is denied as moot.

As for Defendant Cutbank's Motion for Disclosure of Grand Jury Transcripts, [Docket No. 83], despite its objection, the Government has agreed to voluntarily provide Grand Jury testimony transcripts of any grand jury witness who will also be called to testify at trial at least seven (7) business days before trial. (See Gov't's Consolidated Response to Defendants' Pretrial Mot., [Docket No. 93], at pp. 7-8).

Lastly, to the extent Defendant Cutbank seeks the production of all Grand Jury testimony, her Motion for Disclosure of Grand Jury Transcripts, [Docket No. 83], is denied.

The Courts have long recognized that proper functioning of the grand jury system depends upon protecting the secrecy of those proceedings. Douglas Oil Co. v. Petrol Stops Northwest, 411 U.S. 211, 218 (1979). In order to justify disclosure of grand jury materials, a defendant must make a showing of a "particularized need." Thomas v. United States, 597 F.2d 656, 658 (8th Cir. 1979). Defendant Cutbank asserts no facts that tend to establish the requisite particularized need to justify the production of all Grand Jury testimony.

## VIII. Defendant Cutbank's Motion to Sever Defendant. [Docket No. 82].

Defendant Cutbank moves to sever her case from that of her co-defendants—Mia Faye Sumner and Daniel Charles Barrett—pursuant to Federal Rule of Criminal Procedure 14. (Def. Cutbank's Mot. to Sever Defendant, [Docket No. 82]). In response, the Government contends that the Defendants are properly joined and that a joint trial in this case serves the interest of justice. (See Gov't's Consolidated Response to Defendants' Pretrial Mot., [Docket No. 93], at pp. 13-14).

Federal Rule of Criminal Procedure 8(b) provides:

The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Federal Rule of Criminal Procedure 14(a), however, provides: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

> There is a preference in the federal system for joint trials of defendants who are indicted together. This preference is especially compelling when the defendants are charged as coconspirators. It is well settled in this circuit that a motion for relief from an allegedly prejudicial joinder of charges or defendants raises a question that is addressed to the judicial discretion of the trial court . . . .

United States v. Benton, 890 F.3d 697, 713–14 (8th Cir. 2018) (internal quotations omitted).

> Accordingly, if joinder is proper under Rule 8, a defendant seeking severance has the heavy burden of demonstrating that a joint trial will impermissibly infringe his right to a fair trial. United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996). It is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials. Zafiro v. United States, 506 U.S. 534, 540 (1993) (citations omitted) . . . .

> A defendant seeking to sever his trial must therefore show that a joint trial would case real prejudice. United States v. Mickelson, 378 F.3d 810, 817-18 (8th Cir. 2004). Real prejudice exists when (a) [a defendant's] defense is irreconcilable with that of his co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants.

United States v. McConnell, No. 13-cr-273 (SRN/FLN), 2017 WL 111304, *3 (D. Minn. Jan. 11, 2017) (internal quotations omitted).

For example, in Bruton v. United States, 391 U.S. 123, 124 (1968), the petitioner and a co-defendant had been convicted of armed robbery in a joint trial after a postal inspector testified that Bruton's codefendant had confessed and had "expressly implicat[ed]" the petitioner.  Id. at n.1. The trial court instructed the jury that the co-defendant's confession "if used, can only be used against the [co-defendant].  It is hearsay insofar as the [petitioner] is concerned, and you are not to consider it in any respect to the [petitioner], because insofar as he is concerned it is hearsay."  Id. at 125 n. 2.  The Supreme Court, however, concluded that:

> [T]he introduction of [the co-defendant's] confession posed a substantial threat to the petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

Id. at 137. For that reason, the Supreme Court reversed the petitioner's conviction in Bruton. Id. at 126, 137.

However, even the Bruton court suggested that redaction from co-conspirator testimony may be sufficient to cure any prejudice caused by the introduction of a co-defendant's incrimination statement and acknowledged that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions." Id. at 134 n. 10, 135. In Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court further distinguished between co-defendant statements that are "facially incriminating," and statements which merely are "incriminating by connection." Id. at 209. When a co-defendant's statement is facially incriminating of the defendant, redaction or even severance may be required because it is more difficult for jurors to set aside such evidence. Id. at 208. However, the Court rejected the suggestion that the rule in Bruton extend to confessions that are incriminating merely by connection as both impractical and unnecessary. Id. at 208–09.

In the present case, Defendant Cutbank generally argues that "[t]he vast majority of the evidence against the defendants in this matter does not involve [her] and would therefore be prejudicial to her defense" and "[t]here is a conflict of interest between [her] and her co-defendants." (Def. Cutbank's Mot. to Sever Defendant, [Docket No. 82]). Defendant Cutbank's assertion, however, is based solely on speculation at this point.

A motion for severance of defendants cannot be based solely on purely speculation as to only the potential for introduction of prejudicial evidence because the Court cannot determine the

actual prejudice that may exist until it is aware of the actual evidence which will be presented. Moreover, Defendant Cutbank has failed to make any argument as to why a limiting jury instruction could not address Defendant Cutbank's concern that evidence against her co-defendants would be improperly considered with respect to the charges brought against her. Nor has Defendant Cutbank addressed why the redaction of any such evidence could not address her concerns. On the record currently before the Court, it is not apparent that a jury would be unable to appropriately compartmentalize the evidence before it, especially when presented with redacted evidence and with the assistance of limiting jury instructions.

As articulated above, there is a strong preference in the federal system for joint trials. In light of that preference, and at this juncture, where Defendant Cutbank can only invite the Court to speculate as to what evidence the Government might actually seek to introduce at a joint trial or how said evidence may not be suitably redacted, severance is not, at this time, appropriate. "Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances." U.S. v. Rios-Quintero, No. 16-cv-161(1) (MJD/LIB), 2016 WL 6134545, *13 (D. Minn. Sept. 9, 2016) (quoting U.S. v. Billups, 442 F. Supp. 2d 697, 706 (D. Minn. 2006)). If circumstances change at the time of trial, Defendant Cutbank is free to seek redaction or renew her motion to sever before the trial judge at that time. See Billups, 442 F. Supp. 2d at 706.

For the reasons articulated above, Defendant Cutbank's Motion to Sever Defendant, [Docket No. 82], is denied without prejudice.

## IX. Defendant Cutbank's Motion for Disclosure of Confidential Reliable Informant(s). [Docket No. 84].

Defendant Cutbank requests an Order from the Court compelling the Government to disclose the identity of each informant "who is supplying or who had supplied information which formed the background for, or resulted in the Indictment," or were witnesses or participants in the

crimes charged in the Indictment." (Def. Cutbank's Mot. for Disclosure of Confidential Reliable Informant(s). [Docket No. 84].

In its written response, the Government opposes Defendant Cutbank's Motion. (See Gov't's Consolidated Response to Defendants' Pretrial Mot., [Docket No. 93], at pp. 8-9). The Government, however, represented that in the event it chooses to call any confidential informant as a witness at trial, the Government will disclose the identities of the informants and will make efforts to have the individual available for an interview with defense counsel at a mutually agreeable time and place. The Government further represents copies of any prior criminal records for confidential informants who may be trial witnesses will be provided seven (7) days before trial. (Id.).

The Government relies on the "Informer's Privilege" in support of its argument that it is allowed "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Roviaro v. United States, 353 U.S. 53, 59 (1957) (citations omitted). There are several exceptions to the privilege. Id. Of those, the one pertinent to the present case considers the "fundamental requirements of fairness" and a defendant's need to prepare an adequate defense. See Id. at 60-61 ("Where the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.").

"[T]here is no litmus test for determining when disclosure [of an informant's identity] is required[.]" United States v. Lapsley, 334 F.3d 762, 764 (8th Cir. 2003); see also Roviaro, 353 at 62 ("We believe that no fixed rule with respect to disclosure is justifiable."). However, the Eighth Circuit has indicated a court ruling on a motion for disclosure of an informant's identity "must weigh the defendant's right to information against the government's privilege to withhold the

identity of its confidential informants." Lapsley, 334 F.3d at 763–64 (internal quotation marks and citations omitted).

In the case presently before the Court, that balance is best served by requiring the Government to disclose to Defendant Cutbank the identity of any informant whose testimony the Government intends to introduce at trial in the present case or whose identity is otherwise discoverable under Brady, Giglio, and their progeny, or the Government's other discovery obligations. The Government will not be required, at this time, to disclose the identity of all informants who may have been a mere tipster, who was not directly involved in the charged offense, and whose testimony it does not intend to be introduced at the trial in the present case, unless the informant's identity is otherwise discoverable.

Defendant Cutbank's Motion for Disclosure of Confidential Reliable Informant(s), [Docket No. 84], is therefore denied. If the Government determines that it will use any confidential informants as witnesses at trial, the Government shall disclose the identity of those informants to the Defendant and make those informants available for a pretrial interview no later than fourteen (14) calendar days before trial.


## X.    Defendant Sumner's Motion for Disclosure of Post Conspiracy Statements of Co-Defendants and Unindicted Co-Conspirators. [Docket No. 95].

Defendant Sumner seeks an Order compelling the Government to disclose the post-conspiracy statements of all other co-defendants and unindicted co-conspirators along with a designation of which statements or confessions the Government intends to utilize at trial. (Def. Sumner's Mot. for Disclosure of Post Conspiracy Statements of Co-Defendants and Unindicted Co-Conspirators, [Docket No. 95]). Defendant Sumner further seeks an Order granting Defendant

Sumner leave to file motions for severance, suppressions, and or in limine, based on the Government's production. (Id.).

At the Motions hearing, Defendant Sumner indicated that she was specifically seeking statements made by an individual named Victoria Becerra to law enforcement or others regarding alleged confessions of Defendant Sumner, her co-defendants, or any unindicted co-defendants. The Government acknowledged its duty to disclose responsive materials and information within its possession and represented that it will continue to comply with its obligations under Brady, Giglio, and their progeny. However, the Government opposed Defendant Sumner's Motion asserting that she is not entitled at this point in time to post-conspiracy statements by co-defendants or unindicted co-conspirators.

Federal Rules of Criminal Procedure 16 is the primary avenue available to a criminal defendant seeking discovery. United States v. Siewert, No. CRIM. 08-4 DWF/SRN, 2008 WL 3165852, at *2 (D. Minn. June 10, 2008) (citing 3D Federal Practice and Procedure Rule 16 Summary, at 206 (2008 ed.)). Fed. R. Crim. P. 16(a)(1)(A-B) allows for discovery of a defendant's statements. Generally, a criminal defendant has no constitutional right to discovery from the Government beyond the parameters of Rule 16. Siewert, 2008 WL 3165852, at *2.

In the present case, Defendant Sumner asserts that she is entitled to statements purportedly made by Ms. Becerra to law enforcement or others regarding alleged confessions of Defendant Sumner, her co-defendants, or any unindicted co-defendants, because these statements could possibly be admissible against a co-defendant, but would not be admissible against her, thereby creating a Bruton issue. Bruton v. United States, 391 U.S. 123, 124 (1968) (holding that an accused's right of confrontation is violated when the trial court admits evidence of a confession by a jointly tried co-defendant which is inadmissible hearsay as to the accused, but which implicates both the co-defendant and the accused). As noted above, beyond Rule 16, Defendant

Sumner has no constitutional right to discovery, and Defendant Sumner has provided no citation to authority which would allow the Court to <u>require</u> this disclosure at this time beyond <u>Brady</u>; <u>Giglio</u>; and Rule 16.

Therefore, to the extent Defendant Sumner seeks notice and disclosure at the present time of the Government's intent to use or refer to and introduce into evidence at trial the statements or confessions of any co-defendant or unindicted co-conspirator, the motion is denied.

**XI.    Government's Motion for Discovery for Defendant Cutbank, [Docket No. 89]; and Government's Motion for Discovery for Defendant Sumner. [Docket No. 90].**

The Government seeks discovery from Defendant Cutbank and Defendant Sumner, pursuant to Rules 16(b), 12.1, 12.2, 12.3, and 26.2 of the Federal Rules of Criminal Procedure, as well as, Rules 702, 703, and 705 of the Federal Rules of Evidence. (<u>See</u> Gov't's Mots. for Discovery, [Docket Nos. 89, 90]).

**A. Inspection and Copying Pursuant to Rule 16(b)**

**1. Documents and Tangible Objects**

The Government requests that the Court order Defendants Cutbank and Sumner to permit inspection and copying of all books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of Defendants and which Defendants intend to introduce as evidence in their case-in-chief at trial.

Defendants did not object to the request. The motion is granted, and Defendants Cutbank and Sumner shall disclose any such responsive materials no later than fourteen (14) days before trial.

**2. Reports of Examinations and Tests**

The Government further requests from Defendants Cutbank and Sumner all results and reports of physical or mental examinations and of scientific tests or experiments made in

connection with the above captioned matter, or copies thereof, within the possession or control of Defendants, which Defendants intend to introduce as evidence in their case-in-chief at trial or which were prepared by a witness whom Defendants intend to call at trial.

Defendants did not object to the request. The motion is granted, and Defendants Cutbank and Sumner shall disclose any such responsive materials no later than fourteen (14) days before trial.

### 3. Expert Testimony

The Government also seeks a written summary of expert testimony Defendants Cutbank and Sumner intend to use under Rule 702, 703, and 705 of the Federal Rules of Evidence as evidence at trial. The Government asserts that the summary must describe the opinions of the expert witnesses, the basis and reasons therefore, and the witnesses' qualifications.

Defendants did not object to the request. The motion is granted, and Defendants Cutbank and Sumner shall disclose any such responsive materials for experts they intend to call in their case-in-chief at trial no later than forty-five (45) days before trial.[5]

### B. Notice of Alibi Defense

Pursuant to Federal Rule of Criminal Procedure 12.1, the Government seeks an Order from the Court requiring Defendants Cutbank and Sumner, if they intend to claim alibi as a defense, to state the specific place or places at which Defendants claim to have been at the time of the alleged offenses in the above captioned matter and the names and addresses of the witnesses upon whom Defendants intend to rely to establish such alibi.

---

[5] If Defendants intend to use experts only as rebuttal to the Government's experts, if any, offered in the Government's case-in-chief, then the Defendants should make such disclosures fifteen (15) days before trial.

Defendants did not object to this request. The motion is granted, and Defendants Cutbank and Sumner shall give notice of same pursuant to Rule 12.1 as soon as practicable and in no event later than twenty-one (21) days before trial.

### C. Notice of Insanity/Mental Illness Defense

In addition, pursuant to Federal Rule of Criminal Procedure 12.2, the Government requests the Court to order Defendants Cutbank and Sumner, if they intend to rely upon the defense of insanity or introduce expert testimony relating to a mental disease or defect or any other mental condition of Defendants relevant to the issue of guilt, to provide the Government notice of such defense.

Defendants did not object to this request. The motion is granted, and Defendants Cutbank and Sumner shall give notice of same pursuant to Rule 12.2 as soon as practicable and in no event later than twenty-one (21) days before trial.

### G. Witness Statements

The Government seeks all statements within Defendant Cutbank and Sumner's possession or control of any witness that Defendants intend to call in connection with a suppression hearing, detention hearing, trial, or sentencing.

Defendants did not object to this request.  The motion is granted.  To the extent Defendants Cutbank and Sumner have statements in their possession or control of any witness that they intend to call to testify in connection with pretrial motions hearings, trial, or sentencing, Defendants shall disclose such statements to the Government no later than three (3) days before such witness is called to testify.

## XII.    Defendant Sumner's Motion to Suppress Statements, Admissions, and Answers. [Docket No. 58].

Defendant Sumner moves this Court for an Order suppressing her August 20, 2019, statements to Duluth Police Sergeant Joseph DeJesus.  (See Def. Sumner's Mot. to Suppress Statements, Admissions, and Answers, [Docket No. 58]).  In support of this request, Defendant Sumner appears to argue that these statements were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966). (Id.).

### A.  Relevant Facts[6]

The record presently before the Court indicates that, on the early morning of August 20, 2019,[7] multiple police officers, including Duluth Police Sergeant Joseph DeJesus, (hereinafter "Sergeant DeJesus"), were investigating a drive by shooting at the intersection of 24th Avenue West and West 3rd Street in the Lincoln Park area of Duluth, Minnesota.  (See Tr. 51-52).[8]  At approximately 2:30 a.m., Sergeant DeJesus was completing his investigation when he observed what appeared to be a fifteen-year-old female ("Defendant Sumner") standing at the southwest corner of the intersection inside of a glass-enclosed bus shelter.   (Tr. 52-53; Def. Sumner's Ex. 1).[9]  Sergeant DeJesus testified that she caught his attention because she appeared to be an underage female in a high-crime neighborhood late at night.  (Tr. 54; Def. Sumner's Ex. 1).  Sergeant DeJesus walked towards the female to check on her well-being and to determine if she had seen anything related to the shooting investigation.  (Tr. 55-57; Def. Sumner's Ex. 1).

Sergeant DeJesus testified that the female, who he later identified as Defendant Sumner, appeared frightened and very nervous—she was "constantly looking around, looking over her

---

[6] The facts contained in this section are derived from the testimony of Duluth Police Sergeant Joseph DeJesus, and the parties' exhibits presented in the present case.

[7] Defendant Sumner's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 58], refers to the incident date as August 19, 2019; however, Defendant Sumner clarified at the March 22, 2022, Motions Hearing, and in her Memorandum in Support of her Motion, that the correct date is August 20, 2019.

[8] Throughout this Report and Recommendation, the Court refers to the transcript of the March 22, 2022, Motions Hearing by the abbreviation "Tr." (Transcript, [Docket No. 118]).

[9] Defendant's Exhibit 1 is Sergeant DeJesus' Police Report. At the Motions Hearing, Defendant Sumner, without objection, offered the report into evidence as Defendant Sumner's Exhibit 1.  (Tr. 71).

shoulders. . . , moving her arms about, [and] clenching her hands," and he also observed that her "entire body appeared to be trembling." (Tr. 56-57; Def. Sumner's Ex. 1). Defendant Sumner inquired what all the police were doing in the area, and told Sergeant DeJesus that she had not seen anything related to the shooting then being investigated. (Tr. 57). Sergeant DeJesus directed Defendant Sumner to sit in his patrol vehicle to speak with her further and to help ease her nerves. (Tr. 57; Def. Sumner's Ex. 1). Defendant Sumner walked directly towards Sergeant DeJesus' patrol vehicle and sat in the rear with the door closed. (Tr. 57-58).

Sergeant DeJesus then left Defendant Sumner in his patrol vehicle while he finished some tasks related to the shooting investigation. (Tr. 59). Sergeant DeJesus testified that he did not believe Defendant was involved any type of criminal activity, but because she was underage and he suspected that she was under the influence of methamphetamine, he was planning on bringing her to a "safe place." (Tr. 59). Sergeant DeJesus also testified that there were four or five other officers in the area of the intersection involved in the shooting investigation. (Tr. 72).

When Sergeant DeJesus returned to his patrol vehicle, he opened the door and stood in the gap between the door and the patrol vehicle. (Gov't's Ex. 4, at 00:00-00:20).[10] Sergeant DeJesus began asking Defendant Sumner some questions as she sat in the rear of his patrol vehicle. (Def. Sumner's Ex. 1; Gov't's Ex. 4). Specifically, Sergeant DeJesus asked, "What's your first name? What do I call you?" to which Defendant Sumner responded, "Mia." (Gov't's Ex. 4, at 00:20-00:27). Defendant Sumner can be seen looking at Sergeant DeJesus, looking past his shoulders, and looking around the patrol vehicle. Sergeant DeJesus also testified that he observed her "continuously moving her arms and clenching her hands." (Def. Sumner's Ex. 1). He then asked,

---

[10] Government's Exhibit 4 is a thumb drive containing Sergeant DeJesus' body camera footage. At the Motions Hearing, the Government, without objection, offered thumb drive into evidence as Government's Exhibit 4. (Tr. 25). The citations to the body camera footage are in a MM:SS (minutes:seconds) format.

"What's going on Mia?  You're acting a little odd.  Did you see something out here?  Did something happen to you tonight?" (Gov't Ex. 4, at 00:28-00:35). Defendant Sumner can be seen blinking heavily, glancing past Sergeant DeJesus, and mumbling.  (Id. at 00:36-00:38).  Sergeant DeJesus then asked, "Why are you acting so strange, Mia?  Are you high right now?" to which she responded, "Mhmm." (Id. at 00:39-00:44). Defendant Sumner then confirmed that she had consumed methamphetamines "but not in the last few days."  (Id. at 00:45-01:09).

Sergeant DeJesus then stated, "You're acting right now like you're afraid of somebody . . . I don't know, the way you're looking around and darting your eyes around, you're acting like you're afraid of somebody" to which she responded, "Yeah."  (Id. at 01:09-01:18; Def. Sumner's Ex. 1).  Defendant Sumner then denied anything happening to her in Lincoln Park.  (Gov't Ex. 4, at 01:19-01:23).

The following exchange then took place:

Sergeant DeJesus: Where are you trying to go to?
Defendant Sumner: I'm trying to go home.
Sergeant DeJesus: Where's home?
Defendant Sumner: Red Lake.
Sergeant DeJesus: Do you know where you're at right now?
Defendant Sumner: No.
Sergeant DeJesus: Do you know what town you're in right now?
Defendant Sumner: No.
Sergeant DeJesus: Okay, do you know where Duluth, Minnesota is?
Defendant Sumner: Yeah.
Sergeant DeJesus: You're in Duluth, Minnesota, right now.  Do you know anybody in Duluth?
Defendant Sumner: Uh no.
Sergeant DeJesus: No? So where are you going to go in Duluth, right now?
Defendant Sumner: Home.
Sergeant DeJesus: But home's in Red Lake?
Defendant Sumner: Yeah.
Sergeant DeJesus: So how did you get down here to Duluth?
Defendant Sumner: I stole a car.
Sergeant DeJesus: Where's the car at?  Whose car did you steal?
Defendant Sumner: It was my car.
Sergeant DeJesus: You stole your car?
Defendant Sumner: Yeah.

Sergeant DeJesus: But how do you steal your own car?
Defendant Sumner: It wasn't mine. . . it was cause I killed him.
Sergeant DeJesus: It was what?
Defendant Sumner: I killed Fatback.
Sergeant DeJesus: You killed Fatback?
Defendant Sumner: Yeah.
Sergeant DeJesus: And you stole his car?
Defendant Sumner: Yeah.
Sergeant DeJesus: Who's Fatback?
Defendant Sumner: I don't know
Sergeant DeJesus: How did you kill Fatback?
Defendant Sumner: With a gun.
Sergeant DeJesus: Where's the gun?
Defendant Sumner: I don't know, in Red Lake somewhere.

(Gov't's Ex. 4, at 01:23-03:05; Tr. 60-61; Def. Sumner's Ex. 1).  Sergeant DeJesus then asked for

Defendant Sumner's last name and her identification. (Gov't's Ex. 4, at 0:03:02-0:03:18). Sergeant

DeJesus called another officer over and he had Defendant Sumner step out of the patrol vehicle to

perform a pat search for weapons.  (Tr. 62; Gov't's Ex. 4, at 0:03:23-0:04:16).  After finding no

weapons on her, Defendant Sumner was placed in the rear of the patrol vehicle once more.  (Def.

Sumner's Ex. 1).  Sergeant DeJesus testified that, at this point, Defendant Sumner was not under

arrest.  (Tr. 77-78).  Defendant Sumner eventually identified "Fatback" as Daniel Johnson.  (Tr.

63, 75-76; Def. Sumner's Ex. 1).

Based on his belief that she was under the influence of methamphetamine, Sergeant

DeJesus requested for another officer to transport Defendant Sumner to the hospital because she

needed to be medically cleared before being returned home or transported to a juvenile facility.

(Tr. 63-64).  While she was waiting with the other officer, Sergeant DeJesus ran Defendant

Sumner's name in the records management system and found that she was eighteen years old and

had two active warrants for her arrest.  (Tr. 66; Def. Sumner's Ex. 1).  He also found that she had

been recently reported as a runaway in Duluth but was "recovered" just one day prior, on August

19, 2019. (Tr. 66). Sergeant DeJesus testified that, although she was never placed in handcuffs, it was at this point that Defendant Sumner was under arrest. (Tr. 66).

Sergeant DeJesus instructed the officer transporting Defendant Sumner to the hospital to place her on an "arrest hold" so that she could be transported to Arrowhead Juvenile Center on her juvenile warrants once medically cleared. (Def. Sumner's Ex. 1). Sergeant DeJesus had no further interactions with Defendant Sumner. (Tr. 66). Defendant Sumner was transported to St. Luke's Hospital where she was medically cleared and eventually transported to the Arrowhead Juvenile Center. (Def. Sumner's Ex. 1).

At the March 22, 2022, Motions Hearing, Sergeant DeJesus testified that he did not believe Defendant Sumner's statements on August 20, 2019, of stealing a vehicle and killing "Fatback" because he thought they were due to a "meth-induced" paranoia, and because he was not then aware of any homicide occurring in Red Lake. (Tr. 62, 66-67; Def. Sumner's Ex. 1). Defendant Sumner's runaway designation and her juvenile warrants from Duluth further reinforced Sergeant DeJesus' belief that her statements of being involved in a homicide in Red Lake were not credible since she had obvious ties to the community, and she had contact with Duluth Police as early as the day before. (Tr. 67; Def. Sumner's Ex. 1).

Sergeant DeJesus testified that it was not until the following day, August 21, 2019, at approximately 5:00 a.m., that he learned from another patrol sergeant that a homicide had occurred and was being investigated at Red Lake. (Tr. 68; Def. Sumner's Ex. 1). Sergeant DeJesus thereafter contacted the Red Lake Police Department, and he eventually passed on the statements made to him by Defendant Sumner to an FBI Agent from the Bemidji field office. (Tr. 68; Def. Sumner's Ex. 1).

### B. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of [her] [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of [their] freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300-01 (1980)).

A defendant is entitled to a Miranda warning prior to custodial interrogation. Miranda, 384 U.S. at 444-45. Interrogation for Miranda purposes includes "any questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response." United States v. McLaughlin, 777 F.2d 388, 390 (8th Cir. 1985). Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. United States v. Richardson, 427 F.3d 1128, 1132 (8th Cir. 2005).

**C.  Analysis**

Defendant Sumner moves the Court for an order suppressing the August 20, 2019, statements she made to Sergeant DeJesus. (Def. Sumner's Mem., [Docket No. 126]). Defendant Sumner contends that her statements were made during a custodial interrogation, and that they were therefore made in the absence of required warnings under Miranda v. Arizona, 384 U.S. 436

(1966). The Government responds that Defendant Sumner was not in custody, and therefore, she was not subjected to custodial interrogation. (Gov't Mem., [Docket No. 145], at pp. 20-25).

Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of [her] freedom of action in any significant way[.]" Stansbury, 511 U.S. at 322 (quoting Miranda, 384 U.S. at 444). To be subject to suppression under Miranda, a statement must be made while in custody and in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (citing United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)). However, Miranda's requirements only apply to interrogations of suspects who are in custody. Miranda, 384 U.S. at 444 (emphasis added). Furthermore, a consensual encounter does not amount to a custodial situation requiring the administration of Miranda warnings. United States v. Woods, 213 F.3d 1021, 1023 (8th Cir. 2000). And even if the consensual encounter transforms into a Terry stop, "most Terry stops do not trigger the detainee's Miranda rights" even where "[o]ne is not free to leave a Terry stop until the completion of a reasonably brief investigation." United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003).

While Defendant Sumner does not directly challenge her initial interaction with Sergeant DeJesus while standing at the bus stop, the record before the Court clearly indicates that this interaction was a consensual encounter, which did not require the administration of Miranda warnings.

Sergeant DeJesus' testified at the March 22, 2022, Motions hearing that Defendant Sumner initially caught his attention because she was standing at a bus stop in a high crime area late at night, and she appeared to be a minor. He further testified that Defendant Sumner appeared frightened and very nervous, "constantly looking around, looking over her shoulders . . . moving her arms about, clenching her hands, and her entire body appeared to be trembling." Because he was concerned for her safety and suspected that she was under the influence of methamphetamines,

Sergeant DeJesus walked towards Defendant Sumner and inquired whether she had seen anything related to the separate shooting investigation going on in the area. Defendant Sumner responded that she had not. In turn, Defendant Sumner inquired about why the police presence in the area.

The Eighth Circuit has recognized that communications between law enforcement officers and citizens that are consensual in nature and involve no restraint or coercion do not implicate the Fourth Amendment. United States v. Johnson, 326 F.3d 1018, 1021 (8th Cir. 2003). The test of whether a person has been seized or the encounter is consensual is whether the totality of the circumstances is such that a reasonable person would believe she was free to leave. Id. at 1021. Factors to consider include (1) whether the officer was positioned in a way that limited the individual's movement; (2) how many officers were on the scene; (3) whether weapons were displayed; (3) the language and tone used by the officers that would indicate compliance is necessary; (4) whether the officers touched the person; (5) seizure of the individual's property or (6) an indication by the officer that the person is the focus of the investigation. Id. at 1021-22; see also United States v. Lozano, 916 F.3d 726, 729 (8th Cir. 2019).

Here, Sergeant DeJesus was the only officer to approach Defendant Sumner and speak with her, and any other police officers in the area were there to investigate an unrelated shooting. Sergeant DeJesus did not draw his weapon and he did not position himself in any way to restrict her movement. There is nothing to indicate that Sergeant DeJesus' initial questioning was anything else than an attempt to assist her. See United States v. Green, 52 F.3d 194, 198 (8th Cir. 1995) (citations omitted) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place. . . [and] putting questions to [her] if the person is willing to listen."). Under these circumstances, the encounter was consensual. Therefore, because Sergeant DeJesus' "[m]ere police questioning [did] not constitute

a seizure," Miranda is inapplicable here.  United States v. Berry, 394 F.3d 1070, 1074 (8th Cir. 2005).

Sergeant DeJesus and Defendant Sumner's consensual encounter continued.  Sergeant DeJesus next asked Defendant Sumner to sit in his patrol vehicle to speak with her further and to calm her nerves.  Defendant Sumner complied with this request and sat in the rear of the patrol vehicle with the door closed.  Although the rear doors could not be opened from inside the car, Defendant Sumner was not handcuffed, and she was never told that she was suspected of any criminal activity or under arrest.  Defendant Sumner was also aware at this point that any other patrol officers in the area were there only to investigate an unrelated shooting.  Sergeant DeJesus was friendly to her.  Indeed, Sergeant DeJesus testified that he did not pat search Defendant Sumner when he first approached her because he did not believe she was involved in any type of criminal activity, and that, while he did not have a specific plan, his goal was merely to transport her to a safe place.  Placing Defendant Sumner in the rear of his patrol vehicle did not turn what was a consensual encounter into a seizure or otherwise implicate the Fourth Amendment.  See United States v. Coney, 456 F.3d 850, 858 (8th Cir. 2006) (holding that there was no detention, but merely a consensual encounter, where the defendant agreed to sit in the rear of the patrol vehicle to speak with law enforcement during a cold day).  The record here establishes that Defendant Sumner was placed in the rear of Sergeant DeJesus' patrol vehicle not as a suspect to any crime, but to ensure her safety as an apparent minor then in a high crime area late at night who appeared under the influence of methamphetamines.  See, e.g., Wilson v. Damon, No. CIV-08-186-C, 2009 WL 426018, at *5 (W.D. Okla. Feb. 19, 2009) (holding no constitutional violation where there was nothing in the record that the plaintiff was placed in the patrol vehicle to detain her or otherwise restrict her freedom where the defendant officers made the request in the interest of her safety and comfort because it was a cold night and the officers were concerned about her

standing in a dark parking lot at night).  Therefore, at this point, the present record establishes that Defendant Sumner was not seized within the meaning of the Fourth Amendment when she agreed to sit in Sergeant DeJesus' patrol vehicle—this was merely a continuation of their consensual encounter.

The Court next finds that, while seated in the patrol vehicle, Sergeant DeJesus was permitted to ask Defendant Sumner for her name, where she lived, how she came to be in the area, and inquire as to her well-being.  See Gov't's Ex. 4, at 00:28-01:09 ("What's going on Mia?  You're acting a little odd.  Did you see something out here?  Did something happen to you tonight?  "Why are you acting so strange, Mia?  Are you high right now?" You're acting right now like you're afraid of somebody . . . I don't know, the way you're looking around and darting your eyes around, you're acting like you're afraid of somebody.").[11]  The Court has explained "that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required." Florida v. Bostick, 501 U.S. 429, 434-35 (1991).  As discussed, supra, merely being placed in the rear of a patrol vehicle, without more, did not turn this consensual encounter into a seizure.  Sergeant DeJesus' sole motivation for placing her in his patrol vehicle was to ensure her safety and his questions were related to identifying her and his concerns for her safety.  See Wilson, 2009 WL 426018, at *5.  Therefore, to the extent Defendant Sumner seeks to suppress any statements she made related to her identity, where she lives, and her drug use, a Miranda warning was not required, and she is not entitled to have these statements suppressed.

---

[11] In response, Defendant Sumner gave her name and further provided that she had used methamphetamines a few days earlier and that she was from Red Lake.

This consensual encounter between Sergeant DeJesus and Defendant Sumner continued with him asking a further series of questions about if she knew where she was that led to Defendant Sumner making unanticipated statements about stealing a vehicle and shooting an individual. It is these statements that Defendant Sumner specifically seeks to now suppress, arguing that they were obtained in violation of Miranda because they were made during custodial interrogation. (Def. Sumner's Mem., [Docket No. 126], at p. 6). In support, Defendant Sumner cites to several cases, however, the Court believes those cases are inapposite or unpersuasive. In the cases cited by Defendant, there were much clearer indicia of custodial interrogation of individuals then suspected of criminal activity. See e.g., United States v. LeBrun, 363 F.3d 715, 723 (8th Cir. 2004) (distinguishing the appellee's case from U.S. v. Hanson, 237 F.3d 961, 965 (8th Cir. 2001), wherein the defendant in Hanson was found in custody when being questioned because, among other things, the defendant "was depending on the authorities for transportation from the federal building. . . [when he] rode in the backseat of a locked vehicle."); United States v. Kennedy, 573 F.2d 657, 660 (9th Cir. 1978) (holding that the defendant was subjected to custodial interrogation when he was confined in the rear of an FBI vehicle with an agent seated next to him and a second agent in the front seat). Similarly, in United States v. Figueroa-Serrano, 971 F.3d 806, 813 (8th Cir. 2020), the Eighth Circuit found, among other things, that the defendant was in custody when he was handcuffed and placed in the back of the patrol vehicle, but here, Defendant Sumner was not handcuffed. Id.

As previously observed, importantly in those cases, unlike Defendant Sumner, the involved defendants were suspected of criminal activity. See LeBrun, 363 F.3d 715 (suspected of felony murder); Kennedy, 573 F.2d 657 (suspected of fraudulent use of license plates); Figueroa-Serrano, 971 F.3d 806 (suspected of driving under the influence).

Here, Defendant Sumner was not a suspect in Sergeant DeJesus' investigation of the drive by shooting in the area, nor did he suspect her of being involved in <u>any</u> other criminal activity at the time he was interacting with her. See <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) (citing <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005)) (holding that a statement must be made while the <u>suspect</u> is in custody and in response to interrogation in order to be subject to suppression under <u>Miranda</u>).

Put simply, <u>Miranda</u> is inapplicable here where Defendant Sumner was not a suspect to any crime. <u>Miranda</u>, 384 U.S. at 444 (emphasis added).[12] Defendant Sumner was not handcuffed, arrested, or otherwise in custody at this point—she was merely placed in the patrol vehicle to ensure her safety as a continuation of her initial consensual encounter. See <u>Woods</u>, 213 F.3d at 1023. Therefore, to the extent Defendant Sumner seeks to suppress any statements she made related to stealing a vehicle and shooting an individual, she is not entitled to have these statements suppressed.

Assuming solely for the sake of argument that Defendant Sumner was considered a suspect in Sergeant DeJesus' investigation into the drive by shooting in the area triggering the applicability of <u>Miranda</u>, his questions did not amount to interrogation, and Defendant Sumner's statements were voluntary and spontaneous. For example, Sergeant DeJesus inquired how she came to be in the area, to which Defendant Sumner responded, "I stole a car." This non-responsive potentially incriminating comment to routine background questions was spontaneous and voluntary. See

---

[12] However, even if Defendant Sumner was "taken into custody or otherwise deprived of [her] freedom of action in any significant way," <u>Stansbury</u>, 511 U.S. at 322 (quoting <u>Miranda</u>, 384 U.S. at 444), for <u>Miranda</u> to apply, the challenged statements must have been made in response to interrogation. Here, not only was Defendant Sumner not a suspect in any investigation, but none of Sergeant DeJesus' questions at this point were reasonably likely to elicit an incriminating response. See <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) ("[I]nterrogation includes both direct questions and words or actions that an officer should know are reasonably likely to elicit an incriminating response from the <u>suspect</u>.") (emphasis added). In fact, Sergeant DeJesus' questioning into Defendant Sumner's identity and where she was from was akin to routine booking questions. See <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 601-02 (1990) (holding that the booking exception "exempts from <u>Miranda</u>'s coverage questions to secure the biographical data necessary to complete booking or pretrial services.").

Rhode Island v. Innis, 446 U.S. 291, 299 (1980) ("A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings."); see also United States v. Crisolis-Gonzalez, 742 F.3d 830, 837 (8th Cir. 2014) ("Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers.") (quoting United States v. Hayes, 120 F.3d 739, 744 (8th Cir. 1997); United States v. Griffin, 922 F.2d 1343, 1356-57 (8th Cir. 1990). Sergeant DeJesus then asked, "Where's the car at? Whose car did you steal?" to which Defendant Sumner responded, "It was my car." These questions were a "request for clarification" of Defendant Sumner's unanticipated, spontaneous statement that she stole a car, which "generally does not constitute interrogation." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005). Sergeant DeJesus' next question ("But how do you steal your own car?") was also an attempt to clarify a statement that did not make sense. While this could constitute interrogation if the question could "enhance the defendant's guilt or raise the offense to a higher degree," Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989) (citation omitted), here Sergeant DeJesus testified that he did not even believe Defendant Sumner's statements. The Court further finds that Defendant Sumner's response, "It wasn't mine . . . I killed Fatback," was a non-responsive statement that was also spontaneous and voluntary. Innis, 446 U.S. at 299.

However, the Court does find that Sergeant DeJesus and Defendant Sumner's encounter did lose its consensual nature when, following her spontaneous statements of shooting an individual, Sergeant DeJesus asked Defendant Sumner to step out of his patrol vehicle and he performed a pat-down search of Defendant Sumner's person. This pat down was constitutionally permitted under the circumstances. See United States v. Newell, 596 F.3d 876, 879 (8th Cir. 2010) ("[O]fficers may take any measures that are reasonably necessary to protect their personal safety

and to maintain the status quo during the course of the stop.").  Although he may not have believed her statements of stealing a vehicle and shooting an individual, at this point, Sergeant DeJesus had a reasonable basis to be concerned that Defendant Sumner may have a weapon on her, which essentially transformed this consensual encounter into a Terry stop.  See Terry, 392 U.S. at 29. However, this Terry stop would still not have triggered her Miranda rights, even if he had continued to question her (which he did not).  See Pelayo-Ruelas, 345 F.3d at 592.

In sum, the Court finds that Sergeant DeJesus and Defendant Sumner's entire interaction, up until she was subjected to a Terry pat-down search, involved a consensual encounter, which did not trigger Miranda.  Further, Miranda is inapplicable to any statements made by Defendant Sumner while she was sitting in the rear of the Sergeant DeJesus' patrol vehicle because she was not in custody and was not considered a suspect relative to any crime then being investigated by Sergeant DeJesus.  The present record establishes that each action taken by Sergeant DeJesus and any questions asked following his initial contact with Defendant Sumner was an attempt to determine if she was in need of assistance and to transport her to a safe location.  Accordingly, Defendant Sumner is not entitled to have the statements she made to Sergeant DeJesus on August 20, 2019, suppressed pursuant to Miranda.

Accordingly, the undersigned recommends that Defendant Sumner's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 58], be **DENIED**.


**XIII.    Defendant Cutbank's Motion to Suppress Evidence Obtained from Unlawful Search and Seizure. [Docket No. 87].**

Defendant Cutbank moves the Court to suppress all evidence flowing from one state court search warrant and two federal court search warrants outlined below.  (Def. Cutbank's Mot. to Suppress Evidence from Unlawful Search and Seizure, [Docket No. 87]).  Specifically, Defendant

32

Cutbank seeks to suppress all evidence flowing from an August 5, 2019, Search Warrant authorizing the search of a hotel room (the "Hotel Search Warrant"); a December 29, 2020, Search Warrant authorizing the search of three (3) Facebook accounts belonging to Defendant Cutbank (the "First Facebook Search Warrant"); and a July 16, 2021, Search Warrant, authorizing the search of two additional Facebook accounts belonging to Defendant Cutbank (the "Second Facebook Search Warrant").  (Id.).

### A.  Statement of Facts[13]

The record presently before the Court indicates that the Minnesota Department of Corrections ("MDOC") provided FBI Special Agent Justin Montgomery ("SA Montgomery") with a July 23, 2019, email from Defendant Cutbank to an inmate, Kewaun Henderson ("Mr. Henderson"), providing, among other things, that she had just purchased a "black . . . 2010 Cadillac CTS [for] . . . $8,000 (the "Cadillac Sedan")."  (Gov't Ex. 2, at ¶ 32).[14]

SA Montgomery was also separately informed by Jordan Drouillard ("Mr. Drouillard") that, on that same day, July 23, 2019, Mr. Drouillard had gone with Defendant Cutbank, Montana Cutbank ("Montana"), co-Defendant Mia Sumner ("co-Defendant Sumner"), and an unknown male to a Hampton Inn in Bemidji, Minnesota where Defendant Cutbank possessed and accidently discharged a .357 revolver.  (Id.).

Mr. Drouillard also informed SA Montgomery that, on August 2, 2019,[15] and into the following day, Defendant Cutbank, Montana, and co-Defendant Sumner were all with Daniel

---

[13] The facts contained in this section are derived from the testimony of Leech Lake Police Sergeant Travis Hemp and the Government's exhibits presented in this case.

[14] Government's Exhibit 2 is the warrant application, supporting affidavit, and warrant to search Defendant Cutbank's three (3) Facebook accounts. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 2.  (Tr. 25).

[15] The December 29, 2020, Search Warrant Affidavit provides that the date was July 26, 2019.  (Gov't Ex. 2, at ¶ 33).  However, the July 16, 2021, Search Warrant Affidavit clarifies the date as August 2, 2019.  (Gov't Ex. 3, at ¶ 32).  Government's Exhibit 3 is the warrant application, supporting affidavit, and warrant to search Defendant Cutbank's two (2) additional Facebook accounts. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 3.  (Tr. 25).

Johnson ("Johnson") at the Cedar Lakes Hotel and Casino in Cass Lake, MN. (Id. at ¶ 38). Mr. Drouillard had received a message from Mr. Johnson via Facebook, asking Mr. Drouillard to "come pick him up" because he had "just stolen money and narcotics" from Defendant Cutbank, Montana, co-Defendant Sumner, and an unknown individual. (Id.). However, Mr. Drouillard was unable to go as requested. (Id.).

The following day, on August 3, 2019, an individual identified as Adrianna Norris ("Ms. Norris") called to report that the Cadillac Sedan had been stolen by Mr. Johnson; however, Ms. Norris called back one hour later to report that the vehicle had been recovered. (Gov't Ex. 2, at ¶ 29). SA Montgomery also learned that Defendant Cutbank sent a text message to the prior owner of the Cadillac Sedan on August 4, 2019, asking them to report the vehicle stolen to the RLPD. (Id. at ¶ 28).

Mr. Drouillard also informed SA Montgomery that, on August 3, 2019,[16] Defendant Cutbank, along with Montana, co-Defendant Sumner, an unknown Native American male, and an unknown African American male (believed to be Molandas Johnson ("Molandas")), came into his home,[17] demanding to know where Daniel Johnson was. (Id. at ¶ 38). Mr. Drouillard reported that Defendant Cutbank struck him several times in the head with a bolt cutter and Molandes pointed a firearm at his head. (Id.). Mr. Drouillard believed that this firearm was the same .357 revolver that he had observed Defendant Cutbank possess and accidently discharge at the Hampton Inn on July 23, 2019. (Id.). The group eventually left the Residence. (Id.). Mr. Drouillard informed SA Montgomery that he saw Daniel Johnson ("Mr. Johnson") arrive at the Residence in the Cadillac Sedan later on that night. (Gov't Ex. 2, at ¶ 38).

---

[16] The December 29, 2020, Search Warrant Affidavit provides that the date was July 28, 2019. (Gov't Ex. 2, at ¶ 33). However, the July 16, 2021, Search Warrant Affidavit clarifies the date as August 3, 2019. (Gov't Ex. 3, at ¶ 32).

[17] Mr. Drouillard lives in the basement of a residence belonging to Marlena Mondragon, which is the same residence where Mr. Johnson was later shot and killed on August 12, 2019 (the "Residence").

On August 4, 2019, a female caller reported a black-colored vehicle and a maroon-colored vehicle chasing each other through the town of Redby. (Id. at ¶ 28). Shortly thereafter, a Red Lake Police Department officer stopped the Cadillac Sedan being driven by Mr. Johnson. (Id. at ¶ 29). A bullet hole was found in the trunk of the vehicle and Mr. Johnson told the officer that the occupants of a maroon-colored vehicle had been shooting at him. (Id.).

Mr. Drouillard also later reported seeing Mr. Johnson following this shooting incident. (Id. at ¶ 38). Mr. Johnson showed Mr. Drouillard the bullet hole in the trunk, stating that he had been shot while driving through Redby. (Gov't's Ex. 2, at ¶ 38).

Sometime thereafter, Victoria Becerra ("Ms. Becerra"), co-Defendant Sumner's sister, also reported to SA Montgomery that she was communicating with Defendant Cutbank via Facebook. (Id. at ¶ 35). Defendant Cutbank stated via Facebook to Ms. Becerra that "her and her brother [who Ms. Becerra believed was Montana] got into a shootout" with Mr. Johnson. (Id.).

On August 5, 2019, at approximately 2:00 a.m., Leech Lake Tribal Police Department responded to the Cedar Lake Hotel and Casino, located at 6280 Upper Frontage Road in Cass Lake, Minnesota, after hotel security officers reported that a male had dropped two (2) .357 ammunition rounds in the front entryway of the casino. (Tr. 29; Gov't's Ex. 1, at p. 2).[18] The hotel security officers were concerned that the male had a firearm on him, which is a violation of hotel policy and an overall safety concern. (Gov't's Ex. 1, at p. 2).

Leech Lake Tribal Police Sergeant Travis Hemp ("Sergeant Hemp") and Leech Lake Tribal Police Officer Oelke met with security officers at the Casino and Hotel back entryway where they were informed that the male who had dropped the ammunition, who was later identified as Molandas, was in the hotel food court at that time. (Tr. 31). Upon approaching Molandas,

---

[18] Government's Exhibit 1 is the warrant application, supporting affidavit, and warrant to search Room 445. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 1. (Tr. 25).

Sergeant Hemp noticed a bulge near the back of his waistline.  (Tr. 31; Gov't's Ex. 1, at p. 2).

Sergeant Hemp escorted Molandas to a conference room in the casino to speak with him privately,

while hotel security officers stood by.  (Tr. 31, 32).  Due to the concern that he may have a firearm,

Sergeant Hemp performed a pat search of Molandas.  (Tr. 33; Gov't's Ex. 1, at p. 2).  Sergeant

Hemp found a plastic bag in the area where the bulge was first observed, the contents of which

field-tested positive for methamphetamines.  (Tr. 33; Gov't's Ex. 1, at p. 2).  The substance also

weighed 1.1 grams on a non-certified scale.  (Gov't's Ex. 1, at p. 2).  Molandas was placed under

arrest for possession of a controlled substance.  (Tr. 34; Gov't's Ex. 1, at p. 2).

Hotel security officers then informed Sergeant Hemp that, because surveillance of

Molandes showed him leaving Room 445 before and after dropping the two (2) ammunition

rounds, they intended to remove all the occupants of Room 445, pursuant to violations of hotel

policy.  (Tr. 33; Gov't's Ex. 1, at p. 2).  However, due to the possibility of a firearm in Room 445,

hotel security officers asked Sergeant Hemp and Officer Oelke to stand by while they removed the

occupants.  (Tr. 33, 34).  While security and tribal police were walking to Room 445, two

additional individuals identified as Montana and co-Defendant Sumner left Room 445 on their

own.  (Tr. 33; Gov't's Ex. 1, at p. 2).  Sergeant Hemp spoke with co-Defendant Sumner, who

informed him that there were other occupants in Room 445.  (Tr. 43).

At approximately 3:30 a.m., Sergeant Hemp and Officer Oelke followed the hotel security

officers to the door of Room 445.  (Tr. 35).  After being unable to get anyone to come to the door,

the hotel security officers opened Room 445 while Sergeant Hemp and Officer Oelke remained in

the hallway, standing just outside the doorway.  (Tr. 35).  Hotel security officers entered the room,

and they advised Sergeant Hemp that there was "drug paraphernalia all over the countertop and

then the table."  (Tr. 35).  From out in the hallway, Sergeant Hemp could also see through the door

the paraphernalia on the kitchen table, which was "some gloves, and then some tinfoil and some .

36

. . miscellaneous stuff." (Tr. 36, 37). Sergeant Hemp testified at the March 22, 2022, Motions hearing that Room 445 was a hotel room suite with a kitchen to the right, two couches to the left, a fireplace, a balcony, and a bedroom separated by a door from the rest of the suite. (Tr. 36).

Hotel security officers then entered the bedroom of Room 445, and they found two unresponsive individuals—a female laying in the bed and a male on the floor at the end of the bed. (Tr. 37). Because the hotel security officers were unable to get them to respond or wake up, they requested Sergeant Hemp's assistance as a first responder. (Tr. 37-38; Gov't Ex. 1, at p. 2). Sergeant Hemp then entered Room 445, and he went straight into the bedroom to medically assist the unresponsive individuals. (Tr. 37-38; Gov't Ex. 1, at p. 2). While trying to arouse the individuals, Sergeant Hemp observed drug paraphernalia on the floor, a hypodermic needle, and a glass smoking device. (Tr. 38). Sergeant Hemp was eventually able to get the individuals to respond with "a couple [of] sternum rubs." (Tr. 38, 45). Soon thereafter, medical personnel arrived, and the individuals were medically treated and released. (Gov't Ex. 1, at p. 2). The male was identified as Nathan Kotts ("Mr. Kotts"), and the female identified herself as Alexie Wenell. (Tr. 41; Gov't Ex. 1, at p. 2). The hotel security officers then advised them that they had to leave the hotel, which they did. (Tr. 38).

Sergeant Hemp remained to secure Room 445 and contacted Narcotics Investigator Pamela Hodgden ("Investigator Hodgden"), of the Leech Lake Band of Ojibwe Tribal Police, to inform her of the drug paraphernalia he had seen in plain view and to determine whether the room should be held for a search warrant. (Tr. 39, 40). Specifically, Sergeant Hemp observed, in plain view, "a white powdery substance on a piece of tin foil on a table in the kitchen area of the room"; "an open bottle of peroxide"; "some rubber gloves with some fingers cut off"; "numerous hypodermic needles on the top of the garbages in the hotel room"; "a first aid box . . . on the floor of the living room that also contained a crumpled up piece of tin foil, [a] micro baggy[, which field-tested

positive for methamphetamine] and pieces of cotton"; and "a hypodermic needle next to an orange glass smoking device" on the floor next to the bed. Sergeant Hemp also observed a red "Nike" duffle bag sticking out of an open freezer.[19] (Tr. 47-48).

Investigator Hodgden directed Sergeant Hemp to remain at Room 445 while she drafted a search warrant, and Sergeant Hemp secured the room. (Tr. 40). Thereafter, Investigator Hodgden, who was also assigned to the Paul Bunyan Task Force as a Special Agent, applied for a state court warrant to search Room 445 at the Cedar Lake Hotel and Casino located at 6280 Upper Frontage Road in Cass Lake, Minnesota. (See Search Warrant Application, Gov't's Ex. 1). The affidavit that Investigator Hodgden drafted and submitted in support of the warrant application set forth the facts and circumstances outlined above. Investigator Hodgden also provided that, based on her training and experience, drug traffickers, among other things: 1) maintain books, records, receipts, notes, ledgers, etc., in their residence or within their vehicles, which often disclose the locations of other unknown illegal narcotics operations; 2) hide proceeds of drug sales in secure locations like their homes, businesses, or vehicles; drug traffickers usually keep drug paraphernalia for "packaging, diluting, weighing, and distributing their drugs"; and 3) usually have conversations with their suppliers and customers via phone or cellphone. (Gov't's Ex. 1, p. 4).

Later that same day, August 5, 2019, based on the information provided by Investigator Hodgden, the Honorable Jana Austad, District Court Judge, Cass County, State of Minnesota, concluded that there was probable cause to believe that contraband or evidence of a crime would be found in Room 445, and she issued a warrant to search that room (the "Hotel Room Search Warrant") in the Cedar Lake Hotel and Casino located at 6280 Upper Frontage Road in Cass Lake, Minnesota. (See Search Warrant, Gov't's Ex. 1, at pp. 1-3).

---

[19] Sgt. Hemp testified that he saw the bag in the freezer after hotel security officers opened the freezer door to ensure the room was safe for hotel cleaning personnel. (Tr. 47-48)

A few hours later, on August 5, 2019, the Hotel Room Search Warrant was executed for Room 445. (See Evidence Receipt, Gov't Ex. 1). During the search of Room 445, law enforcement seized, among other things, four (4) ".357 Blazer magazine rounds," one (1) "compact mirror with white powdery residue," two (2) "smoking devices," one (1) "black magazine," ten (10) "rounds from magazine 9 mm WMA," "tin foil with white powdery substance," and "needles for disposal." (Id.).

Sergeant Hemp later confirmed through photo identification obtained during the search that the female who had initially identified herself as Alexie Wenell was in fact actually Defendant Cutbank. (Tr. 41, 45-46). He also learned that Defendant Cutbank had an active warrant for her arrest and a missing person alert. (Gov't Ex. 1, at p. 3). A red Ford Taurus was also discovered in the parking lot of the hotel and casino, which was registered to Mr. Kotts. (Gov't Ex. 2, at ¶ 31).

MDOC provided SA Montgomery with a second email sent to Mr. Henderson from Defendant Cutbank on August 10, 2019, wherein Defendant Cutbank provides: "This hotel up here got my phone so I got a new number. I was fucked up last night so the cops came n ran thru my shit. They found a bunch of dope and ammunition"; "I just gave them mfs a fake ass name cause I already knew they would have locked me up if I told them who I was"; "I did a xan with this one nigga I met thru Mia, I passed out and woke up with my car keys n shit missing . . . so now I'm just drillin shit when I go try to get my whip back again." (Gov't Ex. 2, at ¶ 33).

Mr. Drouillard informed SA Montgomery that, on August 11, 2019, he was in the basement of the Residence when he heard Ms. Norris attempting to break the garage door, demanding to know where the Cadillac Sedan was. (Id. at ¶ 39). However, Red Lake Police Department responded to the Residence and ordered Ms. Norris to leave the area. (Id.). Later that evening, he saw Ms. Norris once more at a different home on the west end area of the Red Lake Indian

Reservation.  (Id.).  Mr. Drouillard also reported that Defendant Cutbank was offering a $1000 reward for information leading to the return of the Cadillac Sedan or for information related to Mr. Johnson's whereabouts.  (Id.).

On August 12, 2019, at approximately 12:56 a.m., the Red Lake Police Department ("RLPD") received a call reporting that someone had been shot at the Residence.  (Gov't Ex. 2, at ¶ 27).  Upon arriving at the Residence, RLPD officers found a male, later identified as Mr. Daniel Johnson, deceased in the garage, and a female, identified as Tyra Schoenborn ("Ms. Schoenborn"), with a gunshot wound to her leg.  (Id.).   At the time the officers arrived at the Residence, there were five additional persons at that location: David Jourdain, Brittany Stately, Shaleesa Johns, Kaliesha Anderson, and Matthew Morrison.  (Id.).

Ms. Schoenborn told RLPD officers that, prior to the shooting, she was in the garage using her cellphone when she "heard a vehicle pull up to the [R]esidence" and saw "[s]omeone wearing a dark in color mask, a black in color sweater, and jeans enter[] the garage" followed by "two or three gunshots." (Id.).  Ms. Schoenborn reported that she "crouched down" during the shooting and then felt a pain in her leg.  (Id.).  Ms. Schoenborn further reported that when she looked up, she saw that Mr. Johnson had been shot.  (Gov't Ex. 2, at ¶ 27).  Ms. Schoenborn also reported that the only other individual she saw was the shooter, who did not say anything, whom she believed may have been a male based on physical appearance.  (Id.).

Ms. Schoenborn also reported that Mr. Johnson had earlier stolen the Cadillac Sedan from an unknown female; that the unknown female had been threating Mr. Johnson and his family; and that a shooting on August 4, 2019, was related to the theft of the Cadillac Sedan.  (Gov't Ex. 2, at ¶¶ 27-28).  Mr. Johnson's father, who had arrived on the scene, confirmed to RLPD officers that the day before, on August 11, 2019, an unknown female had approached him while he was at work

to inquire about Mr. Johnson's whereabouts; he confirmed to the female that Mr. Johnson "usually stayed" at the Residence.  (Id. at ¶ 29).

Law enforcement officers also interviewed Mr. Jourdain at the Residence.  (Id. at ¶ 28). He reported being in the garage with Ms. Schoenborn, who was sitting on a stool talking to Mr. Johnson, when a masked female, a masked male, and another masked individual entered the garage.  (Id.).  The masked female fired three shots at Mr. Johnson, causing him to turn around and "slump over."  (Id.).

Ms. Schoenborn was eventually transported to the hospital for treatment of her leg injury, and a search of the garage yielded "three 9 mm Luger cartridges and three 9mm Luger cartridge cases."  (Gov't's Ex. 2, at ¶¶ 27, 28).

Later that day, at approximately 2:30 p.m., MDOC reported that Defendant Cutbank emailed her brother, Michael Cutbank ("Michael"), who was in MNDOC custody, wherein Defendant Cutbank wrote, "Aye bro I need you to make a few phone calls for me or some like ASAP.  Get ahold of your niggas and tell them I need backup around all 3 of these joints around you know where. . . they probably heard what happened by the time you call.  I love you bro."  (Id. at ¶ 34).   At approximately 3:20 p.m., Defendant Cutbank's mother, Mary Wenell called Michael, and in the recorded telephone call, Ms. Wenell is heard stating that she had seen on the internet that Mr. Johnson was killed; that she knew Mr. Johnson had stolen Defendant Cutbank's Cadillac Sedan; and that she shared the information with Defendant Cutbank and Montana, but Defendant Cutbank "got upset and said [Ms. Wenell] was asking too many questions and then later stated that karma got him."  (Id. at ¶ 32).   At approximately 8:17 p.m., Defendant Cutbank sent a third email to Mr. Henderson with a picture of her, co-Defendant Sumner, and another individual identified as Talia Whitefeather ("Ms. Whitefeather").  (Id. at ¶ 34).  Lastly, at approximately 11:41 p.m.,

Defendant Cutbank sent Mr. Henderson another email with a picture of her and two individuals laying on a bed.  (Id.).

On August 13, 2019, an autopsy of Mr. Johnson's body was completed, which determined that Mr. Johnson died of two gunshot wounds, and the manner of death was determined as a homicide.  (Gov't Ex. 2, at ¶ 29).

On August 17, 2019, the Cadillac Sedan that Mr. Johnson had allegedly stolen was seized by the RLPD during an unrelated arrest.  (Id.).  The arrested individual stated that he had purchased the Cadillac Sedan from Mr. Johnson a few days before he was shot and killed.  (Id.).

On August 21, 2019, Ms. Becerra informed SA Montgomery that she had messaged co-Defendant Sumner via Facebook sometime after Mr. Johnson's death, and among other things, Ms. Becerra believed that co-Defendant Sumner may have been involved because co-Defendant Sumner is "best friends" with Defendant Cutbank and was dating Montana at the time.  (Id. at ¶¶ 34-35).  Further, Ms. Becerra stated that Defendant Cutbank and Montana both claimed ownership of the Cadillac Sedan that Mr. Johnson had reportedly stolen before his death.  (Id. at ¶ 35).  SA Montgomery also interviewed Mr. Jourdain on August 21, 2019, who reported, among other things, that he was outside the Residence when he heard three car doors shut; saw three masked individuals appear in the garage doorway; and believed the shooter may have been a female because of shoulder length brown hair.  (Gov't Ex. 2, at ¶ 36).

On September 19, 2019, Ms. Schoenborn informed SA Montgomery that she heard the shooter was possibly Defendant Cutbank and that the Cadillac Sedan that Mr. Johnson had reportedly stolen belonged to Defendant Cutbank.  (Id.).

On September 23, 2019, Ms. Wenell visited Montana, who was being held at the St. Louis County Jail after an unrelated arrest.  (Id. at ¶ 36).  Throughout the recorded conversation, Montana stated multiple times that Defendant Cutbank "needed to die" for the "mess she caused"; and that,

among other things, "'what happened is not his problem, or [Ms.] Wenell's, and [that Ms. Wenell] does not need to worry about it.'" (Id.).

The following day, on September 24, 2019, SA Montgomery re-interviewed Ms. Becerra, who informed him, among other things, that co-Defendant Sumner had admitted that she, Defendant Cutbank, and co-Defendant Barrett exited their vehicle and entered the breezeway connecting the Residence to the garage; that co-Defendant Barrett shot Mr. Johnson and wounded Ms. Schoenborn; that co-Defendant Sumner knew where Mr. Johnson was because Ms. Schoenborn had message "them" on Facebook informing them of his location; and that the motivation for the shooting was because Mr. Johnson had allegedly stolen Defendant Cutbank's Cadillac Sedan. (Gov't's Ex. 2, at ¶ 37).

Approximately six months later, Defendant Cutbank was arrested on March 6, 2020, and charged with carrying/possessing a firearm without a permit, providing a false name, and theft, after she was found hiding in the trunk of a vehicle registered to Molandas and being driven by Ms. Whitefeather who had a .32 caliber revolver. (Id. at ¶ 39).

Approximately nine months thereafter, on December 29, 2020, FBI Special Agent Ryan L. Nilson ("SA Nilson") submitted a Federal Court application seeking authorization to search the contents of fifteen (15) Facebook accounts, including three (3) accounts belonging to Defendant Cutbank. (Gov't's Ex. 2). In "Section I" of "Attachment B" of his application, SA Nilson provided that he sought a search warrant requiring Facebook to disclose all contact and personal identification information; all activity logs from July 20, 2019, through December 31, 2019; all photos and videos from July 20, 2019, through December 31, 2019; all profile information from July 20, 2019, through December 31, 2019; all communications, including pending "Friend" requests from July 20, 2019, through December 31, 2019; all location information, including physical location and IP logs; all record of the account's usage of the "Like" or "fan" feature; all

searches conducted by the account from July 20, 2019, through December 31, 2019; all "lists of friends created by the account"; all information related to the account's "access and use of Facebook Marketplace"; "types of services utilized by the user," including the length of that service and the payment method used; the account settings; and all records of communications between Facebook and any person regarding the account. (Id.).

In "Section II" of "Attachment B" of the application, provided that it sought authorization for law enforcement to seize only the following:

> All information [disclosed by Facebook] in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 113(a)(3), 1111, 1151, and 1153, involving [Defendant Cutbank], and others since July 20, 2019, through December 31, 2019, including . . . information pertaining to the following matters:
> (a) All communications as it relates to the crimes under investigation and motive for the crimes under investigation;
> (b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;
> (c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;
> (d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s). [sic]

(Id.).

In the affidavit submitted in support of the First Facebook Search Warrant, SA Nilson provided the details of the investigation as described above. (Id.). SA Nilson also attested that preservation requests were submitted to Facebook for accounts belonging to co-Defendant Sumner and Montana, but additional accounts were not preserved because they were deactivated prior to the individuals being considered suspects, although they had since been re-activated. (Id. at ¶ 39).

SA Nilson also attested that, based on his training and experience and the facts set forth in his affidavit, there is probable cause to believe that Defendant Cutbank committed a violation of 18 U.S.C. § 113(a)(3) (Assault with a Dangerous Weapon), § 1111 (Murder); and § 1151 and 1153,

as well as, probable cause to search the information described in Attachment A for evidence of crimes described in Attachment B. SA Nilson also provided information regarding the "functionality" of Facebook in regard to search warrants. (Id.). SA Nilson attested that "[u]pon receipt of the information described in Section I of Attachment B, government-authorized persons [would] review that information to locate the items described in Section II of Attachment B." (Gov't's Ex. 2).

On December 29, 2020, U.S. Magistrate Judge Jon T. Huseby determined that probable cause existed to support the issuance of the First Facebook Search Warrant authorizing the search of fifteen (15) Facebook accounts, including three (3) accounts belonging to Defendant Cutbank (the "First Facebook Search Warrant"). (Id.). Thereafter, law enforcement officers executed the First Facebook Search Warrant.

On July 16, 2021, SA Nilson filed a second Federal Court application seeking authorization to search the contents of an additional fifteen (15) Facebook accounts, including two (2) additional accounts belonging to Defendant Cutbank. (Gov't's Ex. 3). In the affidavit filed in support of the second Facebook warrant, SA Nilson provided essentially the same information as he had provided in reference to the First Facebook Search Warrant. (Id.). However, SA Nilson also indicated that, as a result of executing the First Facebook Search Warrant, Facebook provided documentation related to the requested Facebook User IDs, which included additional, previously unknown, Facebook account information and User IDs, two of which belonged to Defendant Cutbank. (Id.).

On that same day, July 16, 2021, U.S. Magistrate Judge Huseby determined that probable cause existed to support the issuance of the Second Facebook Search Warrant authorizing the search of fifteen (15) additional Facebook accounts, including two (2) accounts belonging to Defendant Cutbank (the "Second Facebook Search Warrant"). (Id.). Thereafter, law enforcement officers executed the Second Facebook Search Warrant.

### B. Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).

The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered

in determining the existence of probable cause.'" United States v. Wiley, No. 09–cr–239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005)) (alterations in Wiley). In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. at 238–39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

### C. Analysis

#### 1. Hotel Search Warrant

Defendant seeks an Order of this Court suppressing all evidence flowing from the Search Warrant for Room 445 of the Cedar Lake Hotel and Casino in Cass Lake. (Def. Cutbank's Mem., [Docket No. 132], at pp. 6-20). Defendant Cutbank argues that, because law enforcement unlawfully entered Room 445, their observations of evidence, which provided a basis for probable cause to obtain the Hotel Search Warrant, also tainted it and any evidence seized as a result of the execution of said warrant must be suppressed as fruit of the poisonous tree. (Id.).

As noted above, "searches and seizures 'conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well delineated exceptions.'" United States v. Muhammad, 604 F.3d 1022, 1027 (8th Cir. 2010) (alteration in original) (quoting Minnesota v. Dickerson, 508 U.S. 366, 372 (1993)). Two such exceptions are where voluntary consent has been given or exigent circumstances are present. See, e.g., Carpenter v. Gage, 686 F.3d 644, 648 (8th Cir. 2012) (citing Mincey v. Arizona, 437 U.S. 385, 394 (1978)) ("An 'exigent circumstances' exception to the warrant requirement, however, permits a warrantless entry when the needs of law

enforcement are so compelling that a warrantless search is objectively reasonable."); Golinveaux, 611 F.3d at 959 ("Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to search is a well-recognized exception to the warrant requirement.").  The burden is on the Government to demonstrate voluntary consent or the existence of an exigency. United States v. Robinson, 414 U.S. 218, 243 (1973); United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005).  Further, "[t]he defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994).

i.    *Entry into Room 445*

Defendant Cutbank argues, among other things, that, because hotel security's entry into Room 445 was illegal, the hotel security could not, in turn, grant Sergeant Hemp consent to enter Room 445. (Def. Cutbank's Mem., [Docket No. 132], at p. 11).  The Government does not directly address Defendant Cutbank's argument, instead urging the Court to "focus on the actions of Sergeant Hemp" who entered Room 445 solely to assist with a medical emergency.  (Gov't's Mem., [Docket No. 145], at p. 11).

Briefly addressing Defendant Cutbank's argument, the Court is not persuaded that the hotel security lacked permission or lawful authority to enter Room 445 in the first instance.  While Defendant Cutbank argues that she had a reasonable expectation of privacy in Room 445, the Fourth Amendment applies to state law enforcement actors, not private hotel security employees; therefore, her expectation against warrantless intrusions did not preclude hotel staff entry for purpose of eviction from Room 445 for violating hotel policy.[20]  Given that hotel security had seen

---

[20] State statutes govern a hotel's authority to evict guests under certain circumstances.  See Peoples, 854 F.3d at 996. Under Minnesota law, "[a]n innkeeper may remove or cause to be removed from a hotel a guest or other person who . . . the innkeeper reasonably believes is using the premises for the unlawful possession or use of controlled substances by the person in violation of chapter 152 ...; [or]. . . violates any federal, state, or local laws, ordinances, or rules relating to the hotel.  Minn. Stat. § 327.73, subd. 1(a) (2012).

Molandes leaving and entering Room 445 before and after dropping ammunition rounds on the casino floor, hotel security officers knew this was a violation of hotel policy, justifying Defendant Cutbank's eviction from Room 445. Therefore, not only did Defendant Cutbank not have a constitutional, cognizable right against entry by hotel employees, once she in fact had been evicted by hotel security officers, Defendant Cutbank had no reasonable expectation of privacy in Room 445, and could, therefore, not contest hotel security's later invitation to law enforcement to enter the room. See, e.g., United States v. Rambo, 789 F.2d 1289, 1295-96 (8th Cir. 1986) (hotel employee's consent to search room valid when rental period expired, and control reverted to hotel management.) Because Defendant Cutbank was without standing to constitutionally contest the hotel security's entry, once the eviction had been effected, she also no longer had standing to contest on Fourth Amendment grounds Sergeant Hemp's later entry into her hotel room. As such, Sergeant Hemp's entry into Room 445 at the request of hotel security was pursuant to consent of the hotel. Young v. Harrison, 284 F.3d 863, 867 (8th Cir. 2002); see also United States v. Peoples, 854 F.3d 993, 996 (8th Cir. 2017).[21]

However, even assuming for the sake of argument only that Defendant Cutbank had a legitimate expectation of privacy in Room 445 at the time Sergeant Hemp entered the hotel room, and even if Sergeant Hemp entered Room 445 without formal consent, the Court is persuaded that exigent circumstances also justified his entry. Sergeant Hemp testified that, due to the possibility of a firearm, he was asked by hotel security to remain on the property and stand by in the public

---

[21] Even assuming solely for the sake of argument that hotel security had wrongfully entered Room 445, the hotel security's status as a private actor in entering Room 445, whether "innocent or deliberate. . . reasonable or unreasonable," does not violate the Fourth Amendment. United States v. Jacobsen, 466 U.S. 109, 115 (1984). Furthermore, there is no evidence in the record that the hotel security guards were acting at the direction of Sergeant Hemp when they entered Room 445. See, e.g., United States v. Jacobsen, 466 U.S. 109, 113-14 (1984) (holding that the Fourth Amendment's protections apply only to government actions, or those acting at the direction of government officials and it "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'"). Nor is there evidence that hotel security was acting as agents for Sergeant Hemp. Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 614 (1989).

hallway while they attempted to evict the occupants of Room 445. Sergeant Hemp then remained in the hallway while hotel security lawfully entered the hotel room. While in the hallway, Sergeant Hemp could observe, then in plain view, drug paraphernalia such as "some gloves, and then some tinfoil and some just miscellaneous stuff."

Once in Room 445, hotel security discovered two unresponsive individuals in the bedroom—Defendant Cutbank on the bed and Mr. Kotts on the floor. This information was then relayed to Sergeant Hemp. Sergeant Hemp testified that at the request of hotel security, as a first responder he entered Room 445 and went straight to the bedroom to provide the nonresponsive individuals with medical assistance. He observed, also further in plain view, other drug paraphernalia on the floor, a hypodermic needle, and a glass smoking device. He eventually performed sternum rubs on Defendant Cutbank and Mr. Kotts, which was finally successful in arousing them. Based on the hotel security notifying Sergeant Hemp and requesting that he assist with two unresponsive individuals in the bedroom of Room 445, Sergeant Hemp had an objectively reasonable basis to conclude an exigency existed to enter the room without a warrant because there were two individuals in need of emergency assistance.

On the present record, the Court concludes that the initial entry of Room 445 by Sergeant Hemp was not unreasonable under the Fourth Amendment. See Michigan, 558 U.S. at 47; Carpenter, 686 F.3d at 648. Therefore, Sergeant Hemp was lawfully in Room 445 when he observed in plain view controlled substances and drug paraphernalia on the kitchen table, the floor of the living room, and the floor next of the bedroom.

"Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality." United States v. Simpson, 439 F.3d 490, 493–94 (8th Cir. 2006) (internal quotations omitted) (quoting Hamilton v. Nix, 809 F.2d 763, 765 (8th Cir. 1987)).

The Court finds that, for the reasons stated, it was appropriate to include Sergeant Hemp's "plain view" observations in the affidavit submitted in support of the application for the Hotel Search Warrant. Here, none of his observations were tainted by any illegal entry into the room—his observations stemmed from what he was able to see standing in the hallway outside of Room 445 and from when he entered the room to provide medical aid to non-responsive Defendant Cutbank and Mr. Kotts. Defendants' arguments that the evidence should be suppressed as fruits of an unlawful entry lack merit, and the motions to suppress on this basis should be denied.[22]

### ii.    Probable Cause for the Hotel Search Warrant

To the extent Defendant Cutbank argues that probable cause did not support the Hotel Search Warrant, the Court disagrees. (Id. at pp. 17-19).

"[A] magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009) (quoting United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000) (citing United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993)).

---

[22] Defendant Cutbank appears to suggest that Sergeant Hemp may have searched Room 445 in the interim between his initial entry and the later execution of the Hotel Search Warrant; however, this is simply not supported by the present record. Defendant Cutbank also appears to take issue with Sergeant Hemp remaining in Room 445 until the Hotel Search Warrant was obtained. However, Sergeant Hemp was merely securing the premises until said warrant was obtained. Segura v. United States, 468 U.S. 796, 810 (1984) ("[S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents."); United States v. Ruiz-Estrada, 312 F.3d 398, 404 (8th Cir. 2002) ("The act of securing the apartment while awaiting a search warrant comports with the Fourth Amendment."). Simply put, nothing in the present record indicates that Sergeant Hemp conducted any search of Room 445 in the interim between his initial lawful whether by consent or under exigent circumstances entry and the subsequent execution of the Hotel Search Warrant.

Considering the affidavit submitted in support of the Hotel Search Warrant application which warrant ultimately authorized law enforcement to search Room 445, Judge Austad could reasonably have concluded that there was a fair probability that evidence of the possession and distribution of controlled substance would be found in Room 445.

As discussed above, while standing in the hallway outside of Room 445, Sergeant Hemp observed, in plain view, controlled substance paraphernalia.  Further, when he entered Room 445 at the request of hotel security to medically assist Defendant Cutbank and Mr. Kotts, who were unresponsive in the hotel bedroom, Sergeant Hemp observed controlled substances and more paraphernalia also in plain view.  Once Defendant Cutbank and Mr. Knotts were aroused, medically treated, and released, Sergeant Hemp cleared Room 445 to keep it secure while he spoke with Investigator Hodgden to determine if a search warrant ought to be obtained.

While Sergeant Hemp kept Room 445 secure, Investigator Hodgden applied for and obtained the Hotel Search Warrant.  In her affidavit in support of the Hotel Search Warrant, Investigator Hodgden provided the details of what Sergeant Hemp had informed her about observing.  Specifically, Sergeant Hemp recounted that security staff at the Cedar Lake Casino reported that a male, later identified as Molandes, had dropped two rounds of ammunition inside of the casino; that when Sergeant Hemp arrived on the scene and spoke with Molandes, he found Molandes in possession of 1.1 grams of methamphetamines; that security staff had traced Molandes' activities back to Room 445; and that hotel security requested for Sergeant Hemp to "stand by" while they evicted the occupants of Room 445 for violating hotel policy.  Investigator Hodgden further attested that Sergeant Hemp entered Room 445 at the request of the hotel security to medically assist with two unresponsive individuals, when he observed in plain view "a white powdery substance on a piece of tin foil on a table in the kitchen area of the room"; "an open bottle of peroxide"; "some rubber gloves with some fingers cut off"; "numerous hypodermic needles on

the top of the garbages in the hotel room"; "a first aid box . . . on the floor of the living room that also contained a crumpled up piece of tin foil, [a] micro baggy[, which field-tested positive for methamphetamine] and pieces of cotton"; and "a hypodermic needle next to an orange glass smoking device" on the floor next to the bed. Sergeant Hemp further told Investigator Hodgen that he observed a red "Nike" duffle bag sticking out of an open freezer.

Investigator Hodgden attested in the affidavit to Judge Austad that, based on her training, experience, "peroxide, cotton and needles are commonly possessed by persons that inject controlled substances using hypodermic needles." She further attested that, based on her training and experience, participation in narcotic operations and financial investigations, drug traffickers, among other things: 1) maintain books, records, receipts, notes, ledgers, etc., in their residence or within their vehicles, which often disclose the locations of other unknown illegal narcotics operations; 2) hide proceeds of drug sales in secure locations like their homes, businesses, or vehicles; and 3) usually keep drug paraphernalia for "packaging, diluting, weighing, and distributing their drugs."

Investigator Hodgden's affidavit sufficiently connects Room 445 with, among other things, the sale and possession of controlled substances. Indeed, Investigator Hodgden's affidavit specifically provides that Sergeant Hemp personally observed suspected heroin and methamphetamines and controlled substances paraphernalia, while he was standing in the hallway outside of Room 445 and while lawfully inside of Room 445 to assist with a medical emergency. Judge Austad had not only a substantial basis upon which to conclude that the execution of the Hotel Search Warrant would uncover evidence of a crime, Judge Austad had a sworn affidavit providing that such evidence had already been lawfully observed immediately before the application of the Hotel Search Warrant was prepared and submitted to the Court.

Upon review of Investigator Hodgden's affidavit, this Court finds that Judge Austad had a substantial basis upon which to conclude that the execution of the Hotel Search Warrant would uncover evidence of a crime, and that, as a result, probable cause existed for the issuance of the the Hotel Search Warrant.

In addition, assuming solely for the sake of argument that the affidavit of Investigator Hodgden was not sufficient to establish probable cause, the Court concludes that officers relied in good faith on the probable cause determination by Judge Austad when executing the Hotel Search Warrant.

The record presently before the Court shows that law enforcement's good-faith reliance on the Hotel Search Warrant authorizing the search of Room 445 militates against suppressing the evidence obtained during the execution of the Hotel Search Warrant.  In her affidavit in support of her application for the Hotel Search Warrant, Investigator Hodgden presented sufficient facts indicating that Sergeant Hemp had been invited into the room by private hotel security and had observed suspected controlled substances and controlled substances paraphernalia in Room 445. Accordingly, the affidavit in support of the Hotel Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" nor did it render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."  There is also simply no evidence on the record now before the Court that Judge Austad "wholly abandoned [her] judicial role."

Lastly, Defendant Cutbank appears to argue that the affidavit in support of the Hotel Search Warrant set forth false statements by Sergeant Hemp.  Specifically, she argues there were contradictions between Sergeant Hemp's testimony at the March 22, 2022, Motions hearing, Sergeant Hemp's supplemental report, and the information contained in the search warrant affidavit.  (Def.'s Mem., [Docket No. 126], at pp. 6-14).  However, Defendant Cutbank never

moved for a hearing under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). Therefore, this argument now is improperly raised. Furthermore, to the extent Defendant Cutbank relies on a document, entitled "Supplemental Report," and identified as "Defense Exhibit 2," this document was not offered nor admitted into evidence at the March 22, 2022, Motions hearing; therefore, the Court will not consider it.

Accordingly, to the extent Defendant Cutbank's Motion to Suppress Evidence Obtained from Unlawful Search and Seizure., [Docket No. 87], seeks an Order of this Court suppressing evidence flowing from the execution of the Hotel Search Warrant, the undersigned recommends that Defendant Cutbank's Motion to Suppress Evidence Obtained from Unlawful Search and Seizure., [Docket No. 87], be **DENIED**, with respect to the Hotel Search Warrant.

### 2. First Facebook Search Warrant

Defendant Cutbank next seeks an Order of this Court suppressing evidence flowing from the execution of the First Facebook Search Warrant which authorized law enforcement to search fifteen (15) Facebook accounts, including three (3) Facebook accounts belonging to Defendant Cutbank. (Def. Cutbank's Mem., [Docket No. 132], at pp. 20-25). In support of this request, Defendant Cutbank first argues that the affidavit submitted in support of this First Facebook Search Warrant failed to provide sufficient facts to support a probable cause determination to search her Facebook accounts. (<u>Id.</u>).

Specifically, Defendant Cutbank argues that the search warrant affidavit: 1) failed to allege that the information in her accounts were not available through a public internet search; 2) provides information about messages that were not sent from her accounts, but through other accounts not associated with her accounts; and 3) provided information about an alleged interaction involving Defendant Cutbank in August 2019, that had no association with her Facebook accounts. (<u>Id.</u> at

p. 22).  Defendant Cutbank further argues that her maintaining and using a Facebook account, without more, is not enough to establish probable cause for the account to be searched.  (Id.).

"[A] magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009) (quoting United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000) (citing United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993)).

Considering the affidavit submitted in support of the First Facebook Search Warrant, which authorized law enforcement to search, among other things, Defendant Cutbank's three (3) Facebook accounts, U.S. Magistrate Judge Huseby could reasonably have concluded that there was a fair probability that evidence of the alleged assault and homicide would be found in Defendant Cutbank's Facebook accounts.

Specifically, the Court notes that, in his affidavit, SA Nilson provided the details of the investigation, including the fact that Defendant Cutbank reported purchasing a Cadillac Sedan; one known witness reported that, prior to his death, Mr. Johnson had stolen money and drugs from Defendant Cutbank, among others; and that several known witnesses reported that Defendant Cutbank claimed Mr. Johnson had stolen her Cadillac Sedan.  SA Nilson's affidavit also provided that one known witness reported that, prior to Mr. Johnson's death, Defendant Cutbank was offering $1000 reward for any information about the location of her Cadillac Sedan and the whereabouts of Mr. Johnson; one known witness reported being struck in the head multiple times by Defendant Cutbank, who demanded to know Mr. Johnson's whereabouts; that Mr. Johnson reported being shot at by the occupants of a maroon-colored car while he drove the Cadillac Sedan;

that co-Defendant Cutbank indicated via a Facebook message that she "got into a shootout" with Mr. Johnson; and that, prior to Mr. Johnson's death, Defendant Cutbank and her co-Defendants eventually became aware of Mr. Johnson's location via a Facebook message.

SA Nilson's affidavit also provided that, one of the witnesses at the scene of the shooting reported he believed the shooter was possibly a female because of her shoulder length brown hair; another witness reportedly heard that the shooter was possibly Defendant Cutbank and that the Cadillac Sedan that Mr. Johnson had reportedly stolen belonged to her; and the same witness reported that the motivation for the shooting was reportedly because Mr. Johnson had stolen Defendant Cutbank's Cadillac Sedan.  SA Nilson's affidavit also provided that co-Defendant Sumner reported to her sister that, among other things, she, Defendant Cutbank, and co-Defendant Barrett were involved in the shooting.[23]

This Court finds that U.S. Magistrate Judge Huseby had a sufficient basis upon which to believe that probable cause existed for the issuance of the First Facebook Search Warrant as it relates to three (3) of Defendant Cutbank's Facebook accounts: alexia.cutbank.75, alexia.cutbank.90, and leila.reina.35.  The affidavit contains significant information concerning Defendant's alleged involvement in Mr. Johnson's murder and Ms. Schoenborn's assault; and that Defendant Cutbank communicated with friends through Facebook, at the very least when she admitted to earlier being involved in a "shootout" with Mr. Johnson and that having previously put out a reward for information about the location of the Cadillac Sedan and Mr. Johnson, she eventually learned of his location prior to him being shot to death. The affidavit articulates a sufficient basis upon which to find that a nexus and a fair probability existed to conclude that the

---

[23] Lastly, SA Nilson attested that, based on his training and experience, there was probable cause to believe that Defendant Cutbank committed violations of 18 U.S.C. §§ 113(a)(3), 1111, 1151, and 1153, and that there is probable cause to search the Facebook accounts identified in Attachment A for evidence of these crimes as described in Attachment B.

search of Defendant Cutbank's Facebook accounts would uncover evidence of a crime; thus, there was probable cause to issue the warrant as it relates to Defendant Cutbank's three (3) personal Facebook accounts.

Defendant Cutbank next argues that the First Facebook Search Warrant was a "'fishing expedition'" because it "demand[ed] the production of nearly 17 different individuals," and in the "Particular Things to Be Seized," it listed numerous categories to be searched including, "all contact information; all activity logs; all profile information; . . . all records of Facebook searches performed; all records and contents of communications and messages; and more." (Def. Cutbank's Mem., [Docket No. 132], at p. 23). Defendant Cutbank also asserts that it broadly demands user information spanning July 20, 2019, to December 31, 2019, but this date range does not capture records immediately before and after the murder of Mr. Johnson. Id. at p. 24.

As observed above, the Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and <u>particularly describing the place to be searched</u>, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). To satisfy the particularity requirement, the place to be search must be "described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort" and to avoid mistakenly searching the wrong premises or seizing the wrong items. <u>United States v. Gitcho</u>, 601 F.2d 369, 371 (8th Cir. 1979); <u>United States v. Thomas</u>, 263 F.3d 805, 808 (8th Cir. 2001); <u>United States v. Gleich</u>, 397 F.3d 608, 611 (8th Cir. 2005). "[T]he warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." <u>United States v. Sigillito</u>, 759 F.3d 913, 923 (8th Cir. 2014). "[T]he degree of specificity required will depend on the circumstances of the case and on the type of items involved. This particularity standard is one of 'practical accuracy rather than' of hypertechnicality." <u>United States</u>

v. Sigillito, 759 F.3d 913, 923 (8th Cir. 2014); see Groh v. Ramirez, 540 U.S. 551, 557 (2004); United States v. Fitzgerald, 724 F.2d 633, 637 (8th Cir. 1983).

"Typically, a warrant that is not particular enough cannot be cured by the specificity of the affidavit supporting it" because "[s]pecificity is required in the warrant itself in order to limit the discretion of the executing officers as well as to give notice to the party searched." United States v. Thomas, 263 F.3d 805, 808 (8th Cir. 2001) (citing United States v. Johnson, 541 F.2d 1311, 1315 (8th Cir. 1976)). "However, if the affidavit is incorporated into the warrant, it may cure the particularity defect of the warrant if the affidavit accompanies the warrant and the warrant uses suitable words of reference to incorporate the affidavit." Thomas, 263 F.3d at 808.

On the record now before the Court, the First Facebook Search Warrant authorizing the search three (3) of Defendant Cutbank's Facebook account satisfies the Fourth Amendment's particularity requirement, and it is not constitutionally overbroad. Although the First Facebook Search Warrant authorizing the search of Defendant's three (3) Facebook accounts contained categories of information to be produced by Facebook, those categories were specifically defined and the Search Warrant incorporated "Attachment B" which specifically limited the items to be seized to information "that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 113(a)(3) (Assault with a Dangerous Weapon), § 1111 (Murder); and § 1151 and 1153, involving [Defendant Cutbank], and others since July 20, 2019, through December 31, 2019. . ." (Gov't Ex. 2, at p. 4). In addition to this limiting language, "Attachment B" to the First Facebook Search Warrant also described the types of information which would be included in this limited subset of information. (Id.).

The Eighth Circuit Court of Appeals has found similar limiting language to satisfy the particularity requirement of the Fourth Amendment. United States v. Gleich, 397 F.3d 608, 612 (8th Cir. 2005); United States v. Nieman, 520 F.3d 834, 839 (8th Cir. 2008); United States v.

Sherman, 372 F. App'x 668, 676 (8th Cir. 2010). In so finding, the Eighth Circuit Court of Appeals reasoned that such limiting language "adequately allowed the police to avoid searching and seizing the wrong items." Gleich, 397 F.3d at 612.

The same is true in the present case. The limiting language in "Attachment B" to the First Facebook Search Warrant provides a constitutionally adequate basis to allow law enforcement officers searching Defendant Cutbank's three (3) Facebook accounts to avoid searching and seizing the wrong information.

On the above basis, the Court finds that the First Facebook Search Warrant which authorized law enforcement officers to search Defendant Cutbank's three (3) Facebook account satisfies the Fourth Amendment's particularity requirement. The First Facebook Search Warrant is not constitutionally overbroad.

In addition, the Court here too concludes that law enforcement officers relied in good faith on the probable cause determination by U.S. Magistrate Judge Huseby when executing the First Facebook Search Warrant as it relates to three (3) of Defendant Cutbank's Facebook accounts. See generally Leon, 468 U.S. at 922.

The record currently before the Court shows that law enforcement's good-faith reliance on the First Facebook Search Warrant authorizing the search of Defendant Cutbank's three (3) Facebook accounts militate against suppressing the evidence obtained during the execution of the First Facebook Search Warrant. The affidavit in support of the First Facebook Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. Nor did it render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." Id.

Thus, the Court concludes that the officers involved relied in good faith on the First Facebook Search Warrant which had been issued by Judge Huseby.

Therefore, to the extent Defendant Cutbank's Motion to Suppress Evidence from Unlawful Search and Seizure, [Docket No. 87], seeks an Order of this Court suppressing all evidence flowing from the execution of the First Facebook Search Warrant which authorized law enforcement to search, among other things, three (3) Facebook accounts belonging to Defendant Cutbank, the undersigned recommends that Defendant Cutbank's Motion to Suppress Evidence from Unlawful Search and Seizure, [Docket No. 87], be **DENIED**, with respect to that warrant.

### 3. Second Facebook Search Warrant

Defendant also seeks an Order of this Court suppressing evidence flowing from the execution of the Second Facebook Search Warrant which authorized law enforcement to search fifteen (15) Facebook accounts, including two (2) accounts belonging to Defendant Cutbank. (Def. Cutbank's Mem., [Docket No. 132], at pp. 20-25). Again, Defendant's sole challenge is that the affidavit in support of the Second Facebook Search Warrant fails to establish a nexus between the items to be seized and the place to be searched.

As already discussed, several times above, "a magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009) (quoting United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000) (citing United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993)).

Considering the affidavit submitted in support of the Second Facebook Search Warrant, which authorized law enforcement to search two more of Defendant Cutbank's Facebook accounts, U.S. Magistrate Judge Huseby could reasonably have concluded that there was a fair probability

that evidence of the alleged assault and homicide of Mr. Johnson would be found in Defendant Cutbank's Facebook accounts.

Specifically, the Court notes that SA Nilson's affidavit submitted in support of the application for the Second Facebook Search Warrant contained all of the details of the investigation as provided in his affidavit in support of the application for the First Facebook Search Warrant—as discussed above. In addition, SA Erickson attested that, based on the information collected from the execution of the First Facebook Search Warrant, the fifteen additional Facebook account information and User IDs were identified, which included two additional accounts belonging to Defendant Cutbank.

On the record now before the Court, the undersigned finds that SA Nilson's affidavit in support of the application for the Second Facebook Search Warrant demonstrates that Judge Huseby had a substantial basis upon which to conclude that the execution of the Second Facebook Search Warrant would uncover evidence of a crime, and that, as a result, probable cause existed for the issuance of Second Facebook Search Warrant.

For all the reasons discussed above in relation to the First Facebook Warrant, SA Nilson's affidavit sufficiently connects Defendant's two (2) additional Facebook accounts: Facebook ID 100040559053343 (Baba Yaga/Lexi La Reina) and Facebook ID 100054405191301 (Alexia Cutbank), to her alleged involvement in Mr. Johnson's death and Ms. Schoenborn's assault. Defendant Cutbank, among other things, admitted to earlier being involved in a "shootout" with Mr. Johnson and that having previously put out a reward for information on the location of Mr. Johnson and her Cadillac Sedan, she eventually learned of his location on Facebook prior to his death. The affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime; thus, there was probable cause to issue the warrant as it relates to Defendant Cutbank's two (2) personal Facebook accounts.

As noted above, to satisfy the particularity requirement, the place to be search must be "described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort" and to avoid mistakenly searching the wrong premises or seizing the wrong items.  Gitcho, 601 F.2d at 371; Thomas, 263 F.3d at 808; Gleich, 397 F.3d at 611. Further, "the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized," and "the degree of specificity required will depend on the circumstances of the case and on the type of items involved . . ."  United States v. Sigillito, 759 F.3d at 923; Ramirez, 540 U.S. at 557; Fitzgerald, 724 F.2d at 637.

The Court concludes, for all the reasons already set forth above, supra, that the Second Facebook Search Warrant authorizing the search of two (2) more of Defendant Cutbank's Facebook account satisfies the Fourth Amendment's particularity requirement, and it is not constitutionally overbroad. Although the Second Facebook Search Warrant authorizing the search of Defendant's two (2) additional Facebook accounts contained categories of information to be produced by Facebook, those categories were specifically defined and the Search Warrant incorporated "Attachment B" which specifically limited the items to be seized to information "that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 113(a)(3) (Assault with a Dangerous Weapon), § 1111 (Murder); and § 1151 and 1153, involving [Defendant Cutbank], and others since July 20, 2019, through December 31, 2019. . . ." (Gov't Ex. 2, at p. 4).

In addition to this limiting language, "Attachment B" to the First Facebook Search Warrant also described the types of information which would be included in this limited subset of information. (Id.).  As the Court found in the First Facebook Search Warrant, the limiting language in "Attachment B" to the Second Facebook Search Warrant provides a constitutionally adequate basis to allow law enforcement officers searching Defendant Cutbank's two (2) Facebook accounts

to avoid searching and seizing the wrong information.  See Gleich, 397 F.3d at 612 (finding that similar limiting language satisfied the particularity requirement of the Fourth Amendment and reasoning that such limiting language "adequately allowed the police to avoid searching and seizing the wrong items.").

Accordingly, the Court concludes that, for all the reasons already set forth above, supra, the Second Facebook Search Warrant which authorized law enforcement officers to search Defendant Cutbank's two (2) Facebook accounts satisfies the Fourth Amendment's particularity requirement.  The Second Facebook Search Warrant is not constitutionally overbroad.

Further, assuming solely for the sake of argument that the affidavit of SA Nilson was not sufficient to establish probable cause, the Court concludes once again that officers relied in good faith on the probable cause determination by Judge Huseby when executing the Second Facebook Search Warrant.  See generally, Leon, supra.

Therefore, to the extent Defendant Cutbank's Motion to Suppress Evidence from Unlawful Search and Seizure, [Docket No. 87], seeks an Order of this Court suppressing all evidence flowing from the execution of the Second Facebook Search Warrant which authorized law enforcement to search, among other things, two (2) additional Facebook accounts belonging to Defendant Cutbank, the undersigned recommends that Defendant Cutbank's Motion to Suppress Evidence from Unlawful Search and Seizure, [Docket No. 87], be **DENIED**, with respect to that warrant.

## XIV.  Conclusion

Thus, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.  Defendant Sumner's Motion for Disclosure of Rule 404 Evidence, [Docket No. 53]; is **GRANTED**, as set forth above;

**2.** Defendant Sumner's Motion to Compel Attorney for the Government to Disclose Favorable Evidence, [Docket No. 54], is **GRANTED**, as set forth above;

**3.** Defendant Sumner's Motion for Discovery and Inspection, [Docket No. 55], is **GRANTED**, as set forth above;

**4.** Defendant Sumner's Motion for Disclosure of Early Jencks Act Material, [Docket No. 56], is **DENIED**, as set forth above;

**5.** Defendant Sumner's Motion to Retain Rough Notes, [Docket No. 57], is **GRANTED**, as set forth above;

**6.** Defendant Sumner's Motion to Provide Grand Jury Testimony of Any Witness Who Will Testify at Suppression Hearing, [Docket No. 76], is **DENIED**, as set forth above;

**7.** Defendant Cutbank's Motion to Retain Rough Notes, [Docket No. 77], is **GRANTED**, as set forth above;

**8.** Defendant Cutbank's Motion for Disclosure of 404(b) "Bad Acts" Evidence, [Docket No. 78], is **GRANTED**, as set forth above;

**9.** Defendant Cutbank's Motion to Compel Production of Giglio Material, [Docket No. 79], is **GRANTED**, as set forth above;

**10.** Defendant Cutbank's Motion for Release of Brady Materials, [Docket No. 80], is **GRANTED**, as set forth above;

**11.** Defendant Cutbank's Motion for Disclosure (Early) of Jencks Act Material, [Docket No. 81], is **DENIED**, as set forth above;

**12.** Defendant Cutbank's Motion to Sever, [Docket No. 82], is **DENIED**, as set forth above;

**13.** Defendant Cutbank's Motion for Disclosure of Grand Jury Transcripts, [Docket No. 83], is **DENIED**, as set forth above;

14. Defendant Cutbank's Motion for Disclosure of Confidential Reliable Informant(s), [Docket No. 84], is **DENIED**, as set forth above;

15. Defendant Cutbank's Motion for Discovery and Inspection, [Docket No. 86], is **GRANTED**, as set forth above;

16. Government's Motion for Discovery for Defendant Sumner, [Docket No. 89], is **GRANTED**, as set forth above;

17. Government's Motion for Discovery for Defendant Cutbank, [Docket No. 90], is **GRANTED**, as set forth above; and

18. Defendant Sumner's Motion for Disclosure of Post Conspiracy Statements of Co-Defendants and Unindicted Co-Conspirators, [Docket No. 95], is **DENIED**, as set forth above.

Further, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant Sumner's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 58], be **DENIED**; and

2. Defendant Cutbank's Motion to Suppress Evidence Obtained from Unlawful Search and Seizure, [Docket No. 87], be **DENIED**.

Dated: June 17, 2022                                s/Leo I. Brisbois
                                                    Hon. Leo I. Brisbois
                                                    U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days

after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.