# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 21-cr-268 (SRN/LIB) |
| Plaintiff, | |
| v. | **ORDER** |
| Alexia Gah Gi Gay Mary Cutbank (1), Mia Faye Sumner (2), | |
| Defendants. | |

Deidre Y. Aanstad, United States Attorney's Office, 300 South 4th Street, Suite 600, Minneapolis, MN 55415, for Plaintiff.

R. J. Zayed, Dorsey & Whitney LLP, 50 South 6th Street, Suite 1500, Minneapolis, MN 55402-1498 for Defendant Alexia Gah Gi Gay Mary Cutbank.

Sarah Weinman & Shannon R. Elkins, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 for Defendant Mia Faye Sumner.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Defendants' objections to United States Magistrate Judge Leo I. Brisbois' June 21, 2022 Report and Recommendation ("R&R") [Doc. Nos. 151, 153, 161]. In the R&R, Magistrate Judge Brisbois recommends that Sumner's Motion to Suppress Statements, Admissions, and Answers [Docket No. 58], and Cutbank's Motion to Suppress Evidence Obtained from Unlawful Search and Seizure [Docket No. 87] be denied. Also before the Court is Sumner's Motion for a Continuance [Doc. No 164]. For the reasons set forth below, the Court overrules the objections, adopts the R&R in full, denies the motions to suppress, and grants the motion for a continuance.

1

## I.      BACKGROUND

The factual background of this case is more fully set forth in the R&R, which the Court incorporates by reference herein. (R&R [Doc. No. 151] at 19–23; 33–45.) Defendants Sumner and Cutbank are each charged with one count of murder in the second degree in violation of 18 U.S.C. §§ 2, 1111, 1151, 1153(a), one count of assault with a dangerous weapon in violation of 18 U.S.C. §§ 2, 113(a)(3), 1151, 1153(a), and one count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 2, 113(a)(6), 1151, and 1153(a). (Superseding Indictment [Doc. No. 39].)

Sumner moves for suppression of statements she made on August 20, 2019 to Duluth Police Sergeant Joseph DeJesus ("Sergeant DeJesus"). (Sumner's Mot. Suppress Statements, Admissions, and Answers ("Sumner Mot. Suppress") [Docket No. 58].) Cutbank moves for suppression of all evidence flowing from an August 5, 2019 search warrant authorizing the search of a hotel room (the "Hotel Warrant"); a December 29, 2020 search warrant authorizing the search of three Facebook accounts belonging to Defendant Cutbank (the "First Facebook Search Warrant"), and a July 16, 2021 search warrant authorizing the search of two additional Facebook accounts belonging to Defendant Cutbank (the "Second Facebook Search Warrant") (Cutbank's Mot. Suppress Evidence from Unlawful Search and Seizure ("Cutbank Mot. Suppress") [Docket No. 87].)

## II.     SUMNER'S MOTION TO SUPPRESS

### A.      Background

#### 1.      Factual Background

On March 22, 2022, Magistrate Judge Brisbois conducted a hearing on Defendants' motions to suppress. (March 22, 2022 Motion Hr'g Tr. ("Hr'g Tr.") [Doc. No. 118].) At

the hearing, Duluth Police Sergeant Joseph DeJesus testified that on August 20, 2019, at approximately 2:30 am, he and other police officers were investigating a drive-by shooting at the intersection of 24th Avenue West and West 3rd Street in Duluth, Minnesota. (*Id.* at 51:8–53:6.) While clearing the scene, he noticed Sumner at a nearby bus shelter. (*Id.* at 53:4-24.) He testified that "she appeared to be underage [and] seemed out of place." (*Id.* at 54:15-18.) Concerned for her safety, he approached her. (*Id.* at 54:15-19; 55:12-17.)

Sergeant DeJesus testified that Sumner looked "frightened or nervous," and was "constantly looking around, looking over her shoulders, kind of moving her arms about, clenching her hands, and her entire body appeared to be trembling." (*Id.* at 56:14-18.) His "first impression" was that she was under the influence of methamphetamine. (*Id.* at 56:19-21.) He began to speak with her and asked her if she had seen anything related to the drive-by shooting. (*Id.* at 57:6-12.) Sumner asked him why there were so many officers in the area, and denied seeing anything related to the shooting. (*Id.* at 57:6-12.) Planning to bring her to a "safe place," Sergeant DeJesus testified that he "asked her if she wanted to sit in [his] squad car, and she did." (*Id.* at 57:6-12.) He clarified that "[s]he didn't verbally agree. But when [he] asked her to have a seat in [his] squad car, she just quickly walked towards it." (*Id.* at 58:4-7.)

When Sumner arrived at his squad car, Sergeant DeJesus testified that he opened the back door, she entered the back seat, and then he closed the back door. (*Id.* at 58:13-20.) He testified that if someone is sitting in the back of his squad car, there is "no handle," and they are unable to open the door. (*Id.* at 72:16-19.)

While Sumner sat in his vehicle, Sergeant DeJesus testified that he resumed clearing the crime scene. (*Id.* at 71:20–72:11.) When he returned to his vehicle, he opened the back door, stood in the opening of the door, and began to ask Sumner various questions as he determined how to best assist her. (Gov't's Hr'g Ex. 4 ("Bodycam Footage") at 00:00-00:20.)

Sumner initially did not answer his questions, but eventually provided answers when Sergeant DeJesus persisted with his questioning. (Hr'g Tr. at 72:25–73:7.) According to the bodycam footage introduced at the March 22, 2022 hearing, Sergeant DeJesus asked Sumner if she was high, and asked her which drug she had used. (Gov't's Hr'g Ex. 4 ("Bodycam Footage") at 00:39-00:50.) He then stated, "[o]k. Hey, relax. It's not illegal to be under the influence of meth. You know that, right? It's illegal to possess it, not to be under the influence of it." (*Id.* at 00:51-00:58.)

Sergeant DeJesus then informed Sumner that that she was acting like she was "afraid of somebody," and asked, "did something happen to you tonight?" (*Id.* at 01:10-01:20.) Sumner responded, "no," and Sergeant DeJesus proceeded to ask where she was trying to go, where her home was, and if she knew where she was. (*Id.* at 01:20-01:39.) He let her know that she was in Duluth, Minnesota, and asked if she knew anyone in Duluth, which she denied. (*Id.* at 01:39-01:48.) The following exchange then occurred:

> Sergeant DeJesus: So where are you going to go in Duluth, right now?
> Defendant Sumner: Home.
> Sergeant DeJesus: But home [is] in Red Lake?
> Defendant Sumner: Yeah.
> Sergeant DeJesus: So how did you get down here to Duluth?
> Defendant Sumner: I stole a car.
> Sergeant DeJesus: Where's the car at? Whose car did you steal?
> Defendant Sumner: It was my car.

4

> Sergeant DeJesus: You stole your car?
> Defendant Sumner: Yeah.
> Sergeant DeJesus: But how do you steal your own car?
> Defendant Sumner: It wasn't mine. . . it was cause I killed him.
> Sergeant DeJesus: It was what?
> Defendant Sumner: I killed Fatback.[1]
> Sergeant DeJesus: You killed Fatback?
> Defendant Sumner: Yeah.
> Sergeant DeJesus: And you stole his car?
> Defendant Sumner: Yeah.
> Sergeant DeJesus: Who's Fatback?
> Defendant Sumner: I don't know
> Sergeant DeJesus: How did you kill Fatback?
> Defendant Sumner: With a gun.
> Sergeant DeJesus: Where's the gun?
> Defendant Sumner: I don't know, in Red Lake somewhere.

(*Id.* at 01:54-03:00.)

After this exchange, the bodycam footage shows that Sergeant DeJesus called another officer over, and he had Sumner step out of the vehicle for a pat search for weapons. (*Id.* at 03:02-04:16.; Hr'g Tr. at 62:1-3.)

Sergeant DeJesus testified that he did not believe Sumner when she stated that she had stolen a car, or when she said she killed Fatback. (Hr'g Tr. at 66:8-15; 66:23–67:14.) During the pat down, he can be heard in the bodycam footage saying "she's telling me that she killed a guy in Red Lake, stole his car, and drove to Duluth, which, I find unlikely, but she's tweaking pretty [] hard here." (Gov't Hr'g Ex. 4 ("Bodycam Footage") at 03:56-04:08.)

---

[1] According to Sergeant DeJesus, Sumner eventually identified "Fatback" as an individual by the name of D.J. (Hr'g Tr. at 76:1-2; Def.'s Hr'g Ex. 1 ("Police Report").)

After finding no weapons during the pat search, the bodycam footage shows that Sergeant DeJesus asked Sumner to have a seat in his car. (*Id.* at 04:08-04:16.) Sergeant DeJesus testified that he then ran Defendant Sumner's name in the records management system and learned that she was eighteen years old and had two active warrants for her arrest. (Hr'g Tr. at 66:3-9; Def.'s Hr'g Ex. 1 ("Police Report").) Although he did not expressly advise Sumner, Sergeant DeJesus testified that once he found out about the warrants, he considered her to be under arrest. (Hr'g Tr. at 66:15-22.) He testified that he asked another officer to transport her to St. Luke's Hospital. (*Id.* at 75:15-18.)

Sergeant DeJesus testified that it was not until the following day, August 21, 2019, at approximately 5:00 a.m., that he learned from another patrol sergeant that a homicide had occurred and was being investigated in Red Lake. (*Id.* at 68:2-11; Def.'s Hr'g Ex. 1 ("Police Report").) Sergeant DeJesus thereafter contacted the Red Lake Police Department, and he eventually passed on the statements made to him by Sumner to an FBI Agent from the Bemidji field office. (Hr'g Tr. at 68:2-24; Def.'s Hr'g Ex. 1 ("Police Report").)

### 2.    Procedural Background

Sumner moved for the suppression of statements she made to Sergeant DeJesus in the early morning of August 20, 2019. (Sumner Mot. Suppress at 1–2.) She argues that because she was interrogated in custody and was never read her *Miranda* rights, her statements to Sergeant DeJesus should be suppressed. (*Id.*)

The magistrate judge ruled that Sumner's encounter with law enforcement was consensual, and thus *Miranda* did not apply to statements she made to Officer DeJesus. (R&R at 26.) He further ruled that, if *Miranda* did apply, Sumner's statements were

spontaneous and voluntary, and were not elicited by Officer DeJesus's questioning. (*Id.* at 30–31.) Accordingly, he recommended that the Court deny Sumner's motion.

Sumner argues that the magistrate judge erred in recommending that the Court deny her suppression motion. She objects to the magistrate judge's characterization of her police encounter as "consensual," and contends that she was subject to a custodial interrogation. (Sumner Obj. [Doc. No 161] at 6–13.) Because she was not read her *Miranda* rights, she argues that statements she made to Sergeant DeJesus were obtained in violation of *Miranda*, and must be suppressed. (*Id.*)

**B.    Discussion**

The district court reviews de novo those portions of the R&R to which a specific objection is made and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); accord D. Minn. L.R. 72.2(b).

**1.    The Law of *Miranda***

The Fifth Amendment provides in relevant part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend V. In furtherance of this right, the Supreme Court has held that evidence obtained during a custodial interrogation may only be used against a defendant if he (1) is advised of his rights; and (2) voluntarily, knowingly, and intelligently waives those rights. *Miranda v. Arizona*, 384 U.S. 436 at 444 (1966). Thus, "*Miranda* requires law enforcement officials to advise a person in 'custody,' prior to 'interrogation,' of his right to be free from

compulsory self-incrimination and to the assistance of counsel." *United States v. Sanchez-Velasco*, 956 F.3d 576, 580 (8th Cir. 2020).

"Interrogation under *Miranda* includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005) (quoting *Rhode Island v. Innis*, 466 U.S. 291, 300-01 (1980)).

Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. *United States v. Richardson*, 427 F.3d 1128, 1132 (8th Cir. 2005).

### 2.    Analysis

Sumner objects to the magistrate judge's characterization of her police encounter as "consensual," and contends that she was subject to a custodial interrogation. (Sumner Obj. at 6–13.) She argues that an "objective person" in Sumner's position would not have felt free to leave, and would have believed that she was in custody. (*Id.* at 7–8.) She also contends that Sergeant DeJesus's questions, "how did you kill Fatback?" and "where's the gun?" were not questions normally attendant to arrest, and could serve "no purpose other than to elicit incriminating information." (*Id.* at 9.) The Government responds that the magistrate judge correctly identified the interaction as a consensual encounter, and thus Sumner was not subject to a custodial interrogation. (Gov't's Resp. Objs. at 5–8.)

A custodial interrogation that triggers the need for a *Miranda* warning is one that consists of questioning initiated by law enforcement officers after "a formal arrest or

restraint on freedom of movement of the degree associated with a formal arrest." *Id.* at 580. This is an objective determination considered from the perspective of a reasonable person in the defendant's position. *Stansbury v. California*, 511 U.S. 318, 322-23 (1994).

An individual locked in the back of a police vehicle may be "in custody" for purposes of *Miranda*. *United States v. Dolson*, 673 F. Supp. 2d 842, 872–73 (D. Minn. 2009) (finding defendant was in custody when he was forced into backseat of police vehicle, despite his objections, and officer partially withdrew sidearm during interaction); *United States v. Sims*, 13-cr-109 (DSD/JSM), 2013 WL 4199146, at *6 (D. Minn. Aug. 15, 2013) (finding defendant was in custody when he was handcuffed in back of police car, could not leave, and was not informed until later in interview that he was not under arrest).

However, a defendant's location is not determinative. *See United States v. Roberts*, 975 F.3d 709 (8th Cir. 2020) (holding that individual with hands cuffed, in back of a police vehicle during execution of a warrant was not "in custody" as the questioning was nonconfrontational, officers used a "conversational tone," and officers had indicated that defendant was not under arrest); *United States v. Miller*, 07-cr-410(MJD/JSM), 2008 WL 170592, at *5 (D. Minn. Jan. 16, 2008) (holding that "the fact that defendant was seated in the trooper's squad car . . . does not automatically place him 'in custody' for purposes of *Miranda*"); see also *United States v. Holmes*, 20-cr-221 (ECT/HB), 2021 WL 4146385, at *3 (D. Minn. Sept. 13, 2021) (finding defendant was not in custody when he was interviewed in a small secured room in a police station with two officers, one of whom was armed, as the conversation was "calm, casual, and friendly," defendant had voluntarily entered the police station, and officers did not yet suspect defendant of a crime).

Instead, when conducting the custody inquiry, the Court must consider the "totality of the circumstances that confronted the defendant at the time of questioning." *Sanchez-Velasco*, at 580. The "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (citation omitted).

The Eighth Circuit has identified six non-exclusive factors for courts to consider when conducting this inquiry. These include:

> (1) Whether the suspect was informed at the time of the questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Ferguson*, 970 F.3d 895, 901 (8th Cir. 2020) (*citing United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)).

The first three *Griffin* factors are typically referred to as mitigating factors while the last three factors are considered aggravating factors. *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004).

The Court first considers the three mitigating *Griffin* factors. Sumner did not have unrestrained freedom of movement, as she was first locked in the back of a police car, and then was blocked from exiting the police car by Sergeant DeJesus as he asked her questions. However, Sumner voluntarily entered Sergeant DeJesus's car after he suggested she do so, out of concern for her well-being.  She was not physically restrained by handcuffs, and was

not informed that she could not leave the vehicle. (Hr'g Tr. at 57:6-12; 58:4-7); see *United States v. Al-Esawi*, 07-cr-50(4) (ADM/SRN), 2007 WL 3023413, at *5 (D. Minn. Oct. 12, 2007) ("[F]reedom of movement is fairly considered to be restrained where the person is handcuffed or otherwise physically restrained[,] or expressly forbidden to move[,] or positioned between law enforcement officers.") (internal citations omitted).

And, during their conversation, Sergeant DeJesus tried to put Sumner at ease, assuring her that she was not in trouble.  He said: "Hey, relax. It's not illegal to be under the influence of meth. You know that, right? It's illegal to possess it, not to be under the influence of it." (Gov't's Hr'g Ex. 4 ("Bodycam Footage") at 00:51-00:58.) It is clear from the evidence that Sumner was not the focus of an investigation, and that she was not being arrested. *See United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2008); *see also United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (citing *Griffin*, 922 F.2d at 1349) ("[T]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made…") Thus, in balance, the mitigating factors counsel against a finding that Sumner was in custody.

Turning to the aggravating factors, the Court cannot find that the atmosphere was so "police dominated," that it resembled a formal arrest. *See Miranda*, 384 U.S. at 469. Although there were multiple officers and police vehicles, the objective evidence establishes that the police presence was focused on the investigation of an unrelated drive-by shooting. (Hr'g Tr. at 57:6-22; 51:8–53:6.) "The question is whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the investigation was police dominated." *Griffin*, 922 F.2d

at 1352. Sergeant De Jesus's tone, manner, and questions all were "nonconfrontational" and "conversational," and it was evident from the "context of the questioning" that DeJesus was acting out of concern for Sumner's safety. (Gov't's Hr'g Ex. 4 ("Bodycam Footage") at 01:10-01:48 ("Did something happen to you tonight? . . . Where's home? . . . Do you know anyone in Duluth?").) Finally, the questioning lasted only around five minutes, which weighs against a finding that the interview was "police-dominated." *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005) (noting that when an interview is "not lengthy," it counsels against a finding that the interview was "police-dominated").

Although Sumner was arrested after she spoke with Sergeant DeJesus, the arrest did not occur immediately after questioning and was unrelated to Sergeant DeJesus's questions. (Hr'g Tr. at 66:15-22.) Further, Sergeant DeJesus made no indication during the encounter that Sumner would be arrested. Finally, it is undisputed that Sergeant DeJesus did not use any "strong arm tactics or deceptive stratagems" during his interaction with Sumner. *Ferguson*, 970 F.3d at 901. Accordingly, the Court finds that the aggravating factors weigh against a finding that Sumner was in custody.

When considering the "totality of the circumstances," the Court finds that Sumner was not "subjected to restraints comparable to those of a formal arrest," and thus was not in custody at the time she made these incriminating statements. *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012).

Even if the Court were to find that Sumner was in custody, *Miranda* warnings are only required for police interrogations. *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005). An interrogation includes not only express questioning, but also "any word or

actions on the part of the police . . . that police should know are reasonably likely to elicit an incriminating response from the subject." *Id.* (citing *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)). *Miranda* does not, however, "protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997) (citation omitted).

When Sumner admits to stealing a car, it is in response to Sergeant DeJesus's question, "so how did you get down here to Duluth? . . . " (Gov't's Hr'g Ex. 4 ("Bodycam Footage") at 02:00-02:13.) This question was not "reasonably likely to elicit an incriminating response" from Sumner. *Hull*, 419 F.3d at 767. Instead, it was akin to a routine booking question, which has been held exempt from *Miranda* requirements. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990) (holding that the booking exception "exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services."); *United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1039 (8th Cir. 2010) (finding defendant's incriminating statements in response to routine booking questions were spontaneous, voluntary, and not in response to interrogation).

Sergeant DeJesus's inquiry as to the car Sumner stole may have been "reasonably likely to elicit an incriminating response," regarding a car theft. However, Sumner is not charged with car theft, and Sergeant DeJesus's follow up question, "how do you steal your own car," (Gov't's Hr'g Ex. 4 ("Bodycam Footage") at 02:13-02:23), was not reasonably likely to elicit information about a murder. *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836–37 (8th Cir. 2014) (holding that an inquiry into immigration status was not

reasonably likely to illicit incriminating information about possession of a firearm, thus agent's inquiry was not "interrogation" of suspect in violation of his *Miranda* rights). Sumner's statement, "I killed Fatback," was an unprompted and spontaneous admission, and was not elicited through an interrogation.

Further, the Court concurs with the magistrate judge that Sergeant DeJesus's follow up questions to Sumner's admission that she stole a car, and that she murdered Fatback were "requests for clarification," which "generally [do] not constitute interrogation." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005); *see e.g. United States v. Jones*, 842 F.3d 1077, 1080–83 (8th Cir. 2016) (holding that statement to officer who asked defendant what he meant after he said "[y]ou finally [] got me" was admissible because "[a]n officer's request for clarification of a spontaneous statement does generally not amount to interrogation") (internal quotation omitted); *United States, v. Perez*, 19-cr-00313 (ECT/TNL), 2022 WL 2208324, at *7 (D. Minn. June 21, 2022) (holding that when defendant spontaneously admitted knowledge of a stash of firearms to be transported to Mexico, follow up questions "as to the location of the firearms and where they were going" were permissible requests for clarification, and did not require a *Miranda* warning). Sergeant DeJesus's follow up questions to Sumner's spontaneous admissions were permissible requests for clarification, and did not require a *Miranda* warning.

Because the Court finds that Sumner was not in custody at the time, and even if she was, was not subject to an interrogation reasonably likely to elicit incriminating information, her motion to suppress is denied.

### III. CUTBANK'S MOTION TO SUPPRESS

#### A. Background

##### 1. Factual Background [2]

The record presently before the Court indicates that the Minnesota Department of Corrections ("MDOC") provided FBI Special Agent Justin Montgomery ("SA Montgomery") with a July 23, 2019, email from Defendant Cutbank to an inmate, Kewaun Henderson ("Mr. Henderson"), providing, among other things, that she had just purchased a "black . . . 2010 Cadillac CTS [for] . . . $8,000 (the "Cadillac Sedan")." (Gov't's Ex. 2, at ¶ 32).[3]

SA Montgomery was also separately informed by Jordan Drouillard ("Mr. Drouillard") that, on that same day, July 23, 2019, Mr. Drouillard had gone with Defendant Cutbank, Montana Cutbank ("Montana"), Defendant Sumner, and an unknown male to a Hampton Inn in Bemidji, Minnesota where Defendant Cutbank possessed and accidently discharged a .357 revolver. (Id.).

Mr. Drouillard also informed SA Montgomery that, on August 2, 2019,[4] and into the following day, Defendant Cutbank, Montana, and Defendant Sumner were all at the

---

[2] The facts contained in this section are derived from the testimony of Leech Lake Police Sergeant Travis Hemp and the Government's exhibits presented in this case.

[3] Government's Exhibit 2 is the warrant application, supporting affidavit and warrant to search Defendant Cutbank's three (3) Facebook accounts. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 2. (Tr. 25).

[4] The December 29, 2020, Search Warrant Affidavit provides that the date was July 26, 2019. (Gov't's Ex. 2, at ¶33). However, the July 16, 2021, Search Warrant Affidavit clarifies the date as August 2, 2019. (Gov't's Ex. 3, at ¶32). Government's Exhibit 3 is the warrant application, supporting affidavit, and warrant to search Defendant Cutbank's two

Cedar Lakes Hotel and Casino in Cass Lake, MN. (*Id.* at ¶ 38). Mr. Drouillard had received a message from D.J. via Facebook, asking Mr. Drouillard to "come pick him up" because he had "just stolen money and narcotics" from Defendant Cutbank, Montana, Defendant Sumner, and an unknown individual. (*Id.*). However, Mr. Drouillard was unable to go as requested. (*Id.*).

Sometime thereafter, Victoria Becerra ("Ms. Becerra"), Defendant Sumner's sister, also reported to SA Montgomery that she was communicating with Defendant Cutbank via Facebook (*Id.* at ¶ 35). Defendant Cutbank stated via Facebook to Ms. Becerra that "her and her brother [who Ms. Becerra believed was Montana] got into a shootout." (*Id.*).

On August 5, 2019, at approximately 2:00 a.m., the Leech Lake Tribal Police Department responded to the Cedar Lake Hotel and Casino, located at 6280 Upper Frontage Road in Cass Lake, Minnesota, after security officers reported that a male had dropped two (2) .357 ammunition rounds in the front entryway of the casino. (Tr. 29; Gov't's Hr'g Ex. 1, "Hotel Search Warrant" at p. 2). The hotel security officers were concerned that the male had a firearm on him, which is a violation of hotel policy and an overall safety concern. (*Id.*).

On that same day, Investigator Pamela Hodgden ("Investigator Hodgden") obtained a warrant to search room 445 at the Cedar Lake Hotel and Casino (*Id.* at 6–8.) Leech Lake Tribal Police Sergeant Travis Hemp ("Sergeant Hemp") and Leech Lake Tribal Police

---

(2) additional Facebook accounts. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 3. (Tr. 25).

16

Officer Oelke met with hotel security officers, and were informed that the man who had dropped the ammunition, later identified as Molandas Johnson, was in the hotel's food court. (*Id.* at 2.) According to the warrant affidavit, officers located the man, frisked him for weapons, and brought him to a private room to speak with him. (*Id.* at 2.) During the frisk, officers located a 1.1 gram baggie of methamphetamine. (*Id.* at 2.) Johnson was then placed under arrest for possession of a controlled substance. (*Id.* at 2.)

Investigator Hodgden averred that hotel security officers advised Officer Hemp that surveillance of Johnson showed him leaving room 445 before and after dropping the ammunition rounds. (*Id.* at 2.) Hotel security officers informed Officer Hemp that they intended to remove the occupants of room 445, because of violations of hotel policy. (*Id.* at 2.) According to the warrant affidavit, they requested that Officer Hemp "stand by during the removal," because they were concerned that a firearm may have been in the room. (*Id.* at 2.)

Officer Hemp testified that when they arrived at room 445, the hotel security officers knocked on the door, and when they did not receive a response, they unlocked the door and entered the room. (Hr'g Tr. at 35:8-11.) At that point, Officer Hemp testified that he did not enter the room, but he was able to see visible drug paraphernalia from where he stood in the hall. (*Id.* at 36:17–37:2.) The hotel security officers reported to him that there was "drug paraphernalia all over the countertop and then the table." (*Id.* at 35:21-24.)

Investigator Hodgden averred in the warrant affidavit that hotel security officers found two nonresponsive individuals in the bedroom, later identified as Nathan Kotts and co-Defendant Cutbank, and requested that Officer Hemp enter the room as a first responder

to provide aid. (Gov't's Hr'g Ex. 1 at 3.) Officer Hemp testified that he went straight into the bedroom to provide emergency medical assistance, and was able to wake both individuals, who quickly left the room at hotel security's request. (Hr'g Tr. at 38: 1-23.) According to the warrant affidavit, Officer Hemp noticed a significant amount of drug paraphernalia in plain view in the hotel room. (Gov't's Hr'g Ex. 1 at 3.) He testified that he called an investigator to inquire about the possibility of a warrant because of the visible drug paraphernalia. (Hr'g Tr. at 38:24–39:6.)

Officer Hemp testified that the investigator, Investigator Hodgden, decided to apply for a warrant, and requested that he stay in the hotel room to preserve evidence until the warrant was issued. (*Id.* at 40:1-10.) He testified that he waited in the room, but did not pick up any evidence, open any bags, or search any drawers. (*Id.* at 39:18-25.)

Later that same day, August 5, 2019, based on the information provided by Investigator Hodgden, the Honorable Jana Austad, District Court Judge, Cass County, State of Minnesota, concluded that there was a probable cause to believe that contraband or evidence of a crime would be found in room 445, and she issued a warrant to search that room. (Gov't's Ex. 1, at pp. 1-3.)

A few hours later, on August 5, 2019, the warrant was executed. (*See* Evidence Receipt, Gov't's Ex.1).  During the search of room 445, law enforcement seized, among other things, four (4) ".357 Blazer magazine rounds," one (1) "compact mirror with white powdery residue," two (2) "smoking devices," one (1) "black magazine," ten (10) "rounds from magazine 9 mm WMA," "tin foil with white powdery substance," and "needles for disposal." (*Id.*).

### 2.      Procedural Background

Cutbank has moved for suppression of all physical evidence obtained from the execution of the Hotel Search Warrant, and all records obtained from the execution of two warrants demanding her Facebook records. (Cutbank Mot. Suppress; Cutbank Post-Hr'g Supp. Mem. [Doc. No 132].) She challenges the sufficiency of all three warrants, and alleges that inconsistencies between the Hotel Search Warrant affidavit and Officer Hemp's testimony have tainted the affidavit, and thus any evidence seized during the execution of that warrant must be suppressed. (Cutbank's Post-Hr'g Supp. Mem. at 6–20.)

The magistrate judge recommended that the Court deny Cutbank's motion. (R&R at 55.) He concluded that it was appropriate to include Sergeant Hemp's "plain view" observations in the Hotel Search Warrant affidavit, and that probable cause supported the issuance of the Hotel Search Warrant. (*Id.* at 51–55.) He similarly found that probable cause supported the issuance of the two warrants for Cutbank's Facebook records. (*Id.* at 55–64.)

Cutbank objects to the magistrate judge's recommendation that the Court deny her motion to suppress. (Cutbank Obj. [Doc. No. 153].) She contends that the inconsistencies between the police report, Sergeant Hemp's testimony, and the information in the warrant affidavit support her contention that Sergeant Hemp conducted an illegal, warrantless search of the hotel room before the issuance of the warrant. (*Id.* at 2–3.) She argues that this calls into question the validity of the warrant, as the probable cause determination was based on evidence found during an allegedly unconstitutional search. (*Id.*)

The Government urges the Court to adopt the Report and Recommendation in full. (Gov't's Resp. Objs. [Doc. No. 166] at 1.) It argues that there was probable cause for the Hotel Search Warrant based on Sergeant Hemp' "plain view" observations. (*Id.* at 3.)

**B.     Discussion**

The district court reviews *de novo* those portions of the R&R to which a specific objection is made and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *accord* D. Minn. L.R. 72.2(b).

**1.     The Fourth Amendment**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures" and that "no warrants shall issue, but upon probable cause supported by Oath or affirmation."  U.S. Const. Amend. IV; *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place given the circumstances set forth in the affidavit." *United States. v. Tellez*, 217 F.3d 547, 549 (8th Cir. 2000).

When the issuing judge relies solely upon a supporting affidavit to issue the search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. O'Dell*, 766 F.3d 870, 874 (8th Cir. 2014). Judges issuing search warrants may "draw reasonable inferences from the totality of the circumstances" when reading a warrant application to determine whether probable cause exists. *United States v. Keele*, 589 F.3d 940, 944 (8th

Cir. 2009) (quoting *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir.2009)). Reviewing courts afford "great deference" to the issuing judge's "initial, on-the-scene determination that probable cause has been established." *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010). As long as the issuing judge had a "substantial basis" for determining that the search would "uncover evidence of wrongdoing," the Court must uphold the probable cause determination. *United States v. Horn*, 187 F.3d 781, 785 (8th Cir. 1999). Probable cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Miller*, 11 F.4th 944, 953 (8th Cir. 2021), *cert. denied*, 21-7753, 2022 WL 1914258 (June 6, 2022) (citing *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007)).

### 2.    Analysis

Cutbank argues that evidence demonstrates that Sergeant Hemp conducted a limited, warrantless search of the hotel room prior to the issuance of the search warrant. (Cutbank Obj. at 2.) Specifically, she alleges that the red Nike bag "sticking out of an open freezer," and Cutbank's full name, both described in the Hotel Search Warrant, (Gov't's Hr'g Ex. 1 ("Hotel Warrant") at 3), could only have been found through an impermissible search. (Cutbank Obj. at 2.) She alleges that this search exceeded the bounds of the preliminary or protective sweep of the hotel room. She further argues that these details should not have been included in the affidavit. (*Id.*) She contends that without these details, there was no probable cause for the warrant. (*Id.*)

As the magistrate judge explained, if Cutbank wished to raise an argument that the affidavit contained false statements or omissions, she should have requested a *Franks* hearing. *Franks v. Delaware*, 438 U.S. 154 (1978). She failed to do so and thus her allegations that the warrant affidavit contained false information or omissions are not properly before the Court.

Had she requested a *Franks* hearing, Cutbank would have been required to make "a substantial preliminary showing of a false or reckless statement or omission" and would have been required to "show that the alleged false statement or omission was necessary to the finding of probable cause." *United States v. Engler*, 521 F.3d 965, 969 (8th Cir. 2008) (quoting *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002)). Here, neither the existence of the red Nike bag nor the identity of Cutbank were required for the finding of probable cause, and thus Cutbank would not have been able to meet this substantial burden.

The Court finds that the facts set forth in the warrant affidavit demonstrate a "fair probability" that evidence of criminal activity would be found in the hotel room. *Tellez*, 217 F.3d at 549. The warrant affidavit described Officer Hemp's interaction with Molandas, the drugs found on his person, and the ammunition he allegedly dropped. (Gov't's Hr'g Ex. 1 at 2.) The affidavit also described what Officer Hemp was able to see in plain view in the hotel room, including "a white powdery substance on a piece of tin foil on a table in the kitchen area of the room"; "an open bottle of peroxide"; "some rubber gloves with some fingers cut off"; "numerous hypodermic needles on the top of the garbages in the hotel room"; "a first aid box . . . on the floor of the living room that also contained a crumpled up piece of tin foil, [a] micro baggy[, which field-tested positive for

methamphetamine] and pieces of cotton"; and "a hypodermic needle next to an orange glass smoking device" on the floor next to the bed. (*Id.* at 3.)

Investigator Hodgden attested that, based on her training, experience, "peroxide, cotton and needles are commonly possessed by persons that inject controlled substances using hypodermic needles." (*Id.*) She further attested that, based on her training and experience, participation in narcotic operations and financial investigations, drug traffickers, among other things: 1) maintain books, records, receipts, notes, ledgers, etc., in their residence or within their vehicles, which often disclose the locations of other unknown illegal narcotics operations; 2) hide proceeds of drug sales in secure locations like their homes, businesses, or vehicles; and 3) usually keep drug paraphernalia for "packaging, diluting, weighing, and distributing their drugs." (*Id.* at 3–4.)

The evidence described in the warrant affidavit, together with Investigator Hodgden's attestations regarding the typical behavior of drug dealers, provided a "substantial basis" for determining that the search would "uncover evidence of wrongdoing." *Horn*, 187 F.3d at 785. The affidavit sufficiently connected the hotel room to be searched with the sale and possession of a controlled substance, and thus the Court finds that the warrant to search the hotel room was supported by probable cause.

Moreover, even if probable cause did not exist, the good-faith exception to the exclusionary rule would apply here. Although evidence obtained in violation of the Fourth Amendment must generally be excluded, if officers obtained the evidence pursuant to a warrant and reasonably relied on the issuing judge's probable cause determination, the

disputed evidence will be admitted. *United States v. Leon*, 468 U.S. 897, 906 (1984); *United States v. Hudspeth*, 525 F.3d 667, 676 (8th Cir. 2008).

"[T]he fact that a neutral [judge] has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in objective good faith." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation omitted). There is no evidence here to support an assertion that officers' reliance on the warrant was unreasonable or not in good faith. Accordingly, even if probable cause was lacking with respect to the search warrant affidavit, the evidence is admissible under the good-faith exception to the exclusionary rule.

Cutbank did not specifically object to the magistrate judge's analysis of the Facebook search warrants. After an independent *de novo* review of the files, records and proceedings in the above-entitled matter, the Court finds that there was probable cause for those search warrants.

Accordingly, the Court finds that probable cause supported all three of the contested warrants, and Cutbank's motion to suppress is denied.

## IV.   MOTION FOR A CONTINUANCE.

On July 26, 2022, Sumner moved for a 60-day continuance of the trial that was scheduled to begin on August 29, 2022. (Continuance Mot. [Doc. No 164].) She filed a statement of facts in support of her motion, in which she states that she and her attorney require "more time to receive and review discovery and to prepare for trial." (Fact Statement Supp. Speedy Trial Time Exclusion ("Statement of Facts") [Doc. No 168].) She

acknowledges that her request is voluntary, and that she makes it with "full knowledge" of her rights under the Speedy Trial Act. (*Id.*)

In her motion, she argues that the current schedule will not provide her counsel sufficient time between the instant order and the start of trial. (Continuance Mot. at 3.) Sumner also contends that the Government may seek a second superseding indictment from the grand jury which would charge her with the more serious offense of Murder in the First Degree, and that, when considering this more serious charge, she requires more time to review the evidence against her. (*Id.* at 3.) Finally, counsel for Sumner will be out of the country for two weeks in early September, and thus will be unavailable for trial at this time. (*Id.* at 3.) Neither the Government, nor Sumner's co-defendants object to this request for a continuance of the trial date. (*Id.* at 4; Cutbank Resp. Mot. Continuance [Doc. No. 169] at 1 (noting that Cutbank does not object to a 60-day continuance with trial scheduled to begin on October 31, as long as trial begins before November 14, 2022); Barrett Resp. Mot. Continuance [Doc. No 172]; Gov't Resp Mot. Continuance [Doc. No 170] at 3–5.)

Under the Speedy Trial Act, a trial must "begin within 70 days of the filing of an information or indictment or the defendant's initial appearance." *Zedner v. United States*, 547 U.S. 489, 497 (2006) (citing 18 U.S.C. § 3161(c)). However, "the Act recognizes that criminal cases vary widely and that there are valid reasons for greater delay in particular cases." *Id.* Congress included in the Speedy Trial Act "a long and detailed list of periods of delay that are excluded in computing the time within which trial must start" "[t]o provide the necessary flexibility" in criminal cases. *Id.* (citing 18 U.S.C. § 3161(h)). This list

includes delays caused by continuances granted by courts to best serve the ends of justice.

18 U.S.C. §§ 3161(h)(1)(F), (h)(8)(A). Section 3161(h)(7) excludes any delay

> resulting from a continuance granted by any judge on his own motion or at
> the request of the defendant or his counsel or at the request of the attorney
> for the Government, if the judge granted such continuance on the basis of his
> findings that the ends of justice served by taking such action outweigh the
> best interest of the public and the defendant in a speedy trial.

18 U.S.C § 3161(h)(7)(A).

In granting a continuance under this provision, the Court must consider whether "the failure to grant such a continuance . . . would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." *Id.* § 3161(h) (7)(B)(iv). Relevant here, courts may grant continuances to ensure counsel has sufficient time for "effective preparation." *United States v. Harlan*, 960 F.3d 1089, 1093 (8th Cir. 2020) (citing 18 U.S.C. § 3161(h)(7)(B)(iv).

Sumner's counsel requires additional time to review this Order as well as time to review files and records in anticipation of a potential new charge. (Statement of Facts at 1; Continuance Mot. at 3–4.) The Court finds that "the failure to grant [] a continuance . . . would deny [Sumner's counsel] the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." 18 U.S.C. § 3161(h) (7)(B)(iv). Because the ends of justice served by a continuance outweigh the public's interest in a speedy trial, as contemplated by 18 U.S.C. § 3161(h)(7)(A), the trial in the above-captioned case shall be continued until October 31, 2022.

The period from today, August 19, 2022 through October 28, 2022 shall be excluded from the Speedy Trial Act computations in this case for all Defendants. *United States v. Arrellano–Garcia*, 471 F.3d 897, 899–900 (8th Cir. 2006) (holding, under Speedy Trial Act, exclusions of time attributable to one defendant apply to all co-defendants).

## V.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Sumner's Objection to the Report and Recommendation [Doc. No. 161] is **OVERRULED**;

2. Defendant Cutbank's Objection to the Report and Recommendation [Doc. No. 153] is **OVERRULED**;

3. The Report and Recommendation [Doc. No. 151] is **ADOPTED** in full;

4. Defendant Sumner's Motion to Suppress Statements, Admissions, and Answers [Docket No. 58] is **DENIED**;

5. Defendant Cutbank's Motion to Suppress Evidence Obtained from Unlawful Search and Seizure [Docket No. 87] is **DENIED**;

6. Defendant Sumner's Motion for Continuance of Trial [Doc. No. 164] is **GRANTED**.

   a. Trial on this matter will commence on October 31, 2022;

   b. The period of time from today, August 19, 2022, through October 28, 2022 shall be excluded from the Speedy Trial Act computations in this case; and

   c. An Amended Pretrial Scheduling Order will issue forthwith.

**IT IS SO ORDERED.**

Dated: August 19,  2022                         s/Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States District Judge